DANIEL J. HAYES (IL Bar No. 6243089)
Email: hayesdj@sec.gov
MICHAEL D. Foster (IL Bar No. 6257063)
Email: fostermi@sec.gov
JAKE A. SCHMIDT (IL Bar No. 6270569)
Email: schmidtj@sec.gov
KEVIN A. WISNIEWSKI (IL Bar No. 6294107)
Email: wisniewskik@sec.gov

175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-3368
Facsimile: (312) 353-7398

*Attorneys for Plaintiff United States Securities
and Exchange Commission*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>_____/<br><br>This Filing Relates to:<br><br>*U.S. S.E.C. v. Volkswagen AG,*<br>No. 3:19-cv—1391-CRB | MDL No. 2672 CRB (JSC)<br><br>**MEMORANDUM CONCERNING SEC'S VOLKSWAGEN INVESTIGATION**<br><br>Date:<br>Time:<br>Judge: Charles R. Breyer<br>Courtroom: 6, 17th Floor |

1

## TABLE OF CONTENTS

2    I.      INTRODUCTION ...........................................................................................1

3    II.     SUMMARY OF INVESTIGATION.............................................................1

4    III.    THE STAFF CONDUCTED A THOROUGH AND DILIGENT INVESTIGATION ......5

5

6            A.      The ABS Investigation………………………………………….....5

             B.      The Bond Investigation………………………………………….8

7            C.      The Wells Process…………………..………………………….11

8    IV.     THE SEC ACTED EQUITABLY IN PURSUING THIS INVESTIGATION .....……13

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**

3 *Kokesh v. SEC*, 137 S.Ct. 1635 (2017)...................................................................................14

4 *SEC v. Cuban*, 798 F. Supp. 2d 783 (N.D. Tex. 2011)...........................................................14

5 *SEC v. Gulf & Western Indus., Inc.*, 502 F. Supp. 343 (D.D.C. 1980)..................................14

6 *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984)................................................................5

7 *SEC v. Kaplan*, 397 F. Supp. 564 (E.D.N.Y. 1975)................................................................5

8 *United States v. Summerlin*, 310 U.S. 414 (1940)................................................................14

9 *Woolley v. United States*, 97 F.2d 258 (9th Cir. 1938).........................................................5

10

**Statutes**

11 15 U.S.C. § 77s(b)....................................................................................................................5

12 15 U.S.C. § 78u(a), (b)..............................................................................................................5

13 28 U.S.C. § 2462.....................................................................................................................13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Concerning SEC's Volkswagen Investigation          Case No. 3:19-cv-01391-CRB

# I.
# INTRODUCTION

At the initial case status hearing held on May 10, 2019, the Court ordered the SEC to file a declaration explaining why it did not file this suit before March 14, 2019. To answer the Court's question, the SEC submits this Memorandum and accompanying Declaration of Jeffrey Shank ("Declaration"), attached as Exhibit A. In addition to explaining why the SEC filed its complaint when it did, the Declaration contains a detailed description of the investigative steps taken by the Staff during the investigation.

This Memorandum is divided into three sections: (i) a summary of the SEC's investigation; (ii) a more detailed discussion of the various stages of the investigation, including areas where the SEC Staff faced challenges in gathering necessary evidence; and (iii) a discussion of the equitable concerns inherent to the Court's question regarding the timing of this lawsuit.

# II.
# SUMMARY OF INVESTIGATION

This lawsuit was filed after several years of litigation before this Court relating to VW's emissions defeat device. Given that timing, the Court has questioned whether the SEC stood by, observed these years of litigation by others, and then belatedly attempted to join the fray to extract additional relief from the defendants. That simply was not the case.

To the contrary, the filing of the SEC's complaint was the culmination of a thorough and complex investigation involving a large, multinational corporation headquartered in Germany that sold, over a period of 18 months, more than $13 billion of bonds and asset-backed securities ("ABS") to U.S. investors, across 7 different offerings. During its investigation, the Staff examined numerous public and private securities offerings by VW, issued at least 40 document/information requests and subpoenas, received and reviewed approximately 2 million pages of documents produced by at least 18 parties, and interviewed or took testimony from at least 20 witnesses. The Staff's investigation explored and exposed complex factual issues that had not previously been the subject of prior claims by other government authorities.

Throughout, the Staff faced and overcame numerous and substantial challenges to

completing its investigation. Those challenges included long delays by VW in producing documents and other information, uncooperative witnesses who were reluctant or altogether refused to speak to the Staff, and efforts (with mixed success) to navigate cumbersome procedures for collecting evidence located abroad. Despite these many obstacles, the Staff completed its investigation, extended to VW and Mr. Winterkorn a full opportunity to respond to the Staff's findings and have their arguments heard by SEC senior officers, and attempted to resolve this matter. When efforts to settle failed, this lawsuit followed.

The Staff's investigation began on September 21, 2015, when the Staff opened a preliminary inquiry following the public announcement of VW's clean diesel fraud. Over the next year, the Staff sent out numerous requests for documents and interviewed witnesses to determine whether VW and its affiliates violated the federal securities laws, including in connection with the sale of billions of dollars of ABS in the United States ("ABS investigation").

In mid-2016, the Staff explored a possible early resolution of its ABS investigation through settlement with VW, either directly or as part of global settlement negotiations with the Department of Justice and other federal agencies. VW, however, was not willing to engage in settlement discussions with the SEC, and the SEC was excluded from the global settlement negotiations. With no prospect for a settlement, the Staff moved forward with its investigation and told VW it was doing so.

The Staff sought to develop as complete a record as possible, focusing particularly on the process by which VW and its affiliates prepared the relevant securities offering documents. Of critical importance were the following unanswered questions:

      (i)     Who at VW had knowledge of the offerings?

      (ii)    Who was involved in the preparation and approval of offering documents and other materials disseminated with those offerings?

      (iii)   Who had the ability to control the contents of the offering materials?

      (iv)   Which of those individuals were aware of VW's use of a defeat device and other material facts relating to the defeat device scheme and VW's emissions issues, such as the results of the ICCT Study?

Although VW's settlements with other government authorities shed some light on the

2

1    participation by a few VW officials in the clean diesel emissions fraud, those settlements did not

2    answer these questions, which were specific to the SEC's inquiry. The answers were important to

3    understanding whether VW acted with scienter (or negligently) in making the statements and

4    omissions as part of the securities offerings that the SEC now alleges were false and misleading.

5    However, many of the documents and witnesses with those answers—particularly with respect to

6    VW's bonds—were in Germany, and some of those witnesses were subject to continuing

7    criminal investigations or indictments. Although VW held the answers to most of the SEC's

8    questions, it often took VW months—and only after repeated follow up by the Staff—to produce

9    the documents and other information the Staff requested. In other instances, the Staff

10   encountered long delays trying to complete the procedural steps necessary to interview witnesses

11   in Germany, only to have their interview requests denied.

12        By spring 2017, the Staff's ABS investigation was nearly complete. But the ABS

13   investigation spawned the second part of the investigation—an inquiry into whether VW violated

14   the federal securities laws in its offer and sale of over $8 billion of bonds to U.S. investors

15   ("bond investigation"). The Staff identified the bond offerings during its ABS investigation. As

16   with the ABS investigation, the Staff had to explore many facts about the process by which VW

17   and its affiliates prepared the bond offering documents and their responses to the underwriters'

18   due diligence questionnaires. In some instances, the Staff learned relatively early in its

19   investigation that certain VW personnel knew about VW's emissions problems, but did not learn

20   until much later that those personnel also were involved in preparing VW's misleading offering

21   documents.

22        The facts relating to the production of one set of critical documents are illustrative.

23   Beginning in April 2017, the Staff asked VW to identify the persons with the most knowledge

24   about how the bond offerings were prepared. By August 2017, the Staff specifically requested

25   that VW (i) identify the individuals involved in preparing the bond offering documents, (ii)

26   provide the staff with information about the preparation, review, and approval of the bond

27   offering documents, and (iii) produce any documents that tracked which persons and

28   departments approved the documents. In 2017, VW produced to the Staff over 1.6 million pages

3

1  of documents. Absent from those productions were spreadsheets that identified VW employees

2  and departments involved in preparing the bond offering documents. The Staff did not learn that

3  those spreadsheets even existed until early December 2017, when the Staff traveled to London,

4  England to take the testimony of VW personnel. Even after a witness disclosed the existence of

5  the spreadsheets, VW took two additional months to produce these documents to the Staff.[1]

6       Soon after VW produced the spreadsheets—by spring 2018—the Staff's bond

7  investigation was nearly complete. The Staff served VW with Wells notices on June 28, 2018.

8  The period from July 2018 through January 2019 was consumed with a lengthy Wells process,

9  settlement discussions, and a five-week shutdown of the federal government that ended on

10  January 25, 2019. After the government reopened, the Staff sought and obtained, on February 28,

11  2019, the approval of the SEC's Commissioners to bring an enforcement action against: (i)

12  VWAG, (ii) its American financing subsidiaries—Volkswagen Group of America Finance, Inc.

13  ("VWGoAF") and Volkswagen Credit, Inc. ("VCI"), and (iii) Mr. Winterkorn, VWAG's former

14  CEO and Chairman.

15       The SEC filed its complaint on March 14, 2019.

16       Determining which employees of a large corporation were involved in preparing or

17  providing information incorporated into multiple securities offering documents and whether

18  those individuals were aware of specific facts at the time of the offerings is a labor-intensive and

19  time-consuming task even in the best of circumstances, where all the witnesses and documents

20  are located in the United States. It is significantly more difficult when, as here, the majority of

21  documents and knowledgeable witnesses are in a foreign country, many were not willing to

22  cooperate with the SEC's investigation, and the entity that had the relevant information, VW,

23  was often slow in responding to the Staff's requests. In such cases, gathering and reviewing

24  _____

25  [1] The Staff needed the information contained in the spreadsheets to complete its investigation. Take VW MANAGER 1, as an example. In its complaint, the SEC alleges VW MANAGER 1 knew by May 2014 that: (i) VW's diesel vehicles were violating U.S. emissions laws, (ii) VW

26  was facing investigations by government regulators in the U.S., and (iii) VW's potential liability for the emissions problems exceeded $20 billion. (Ex. A ¶¶ 98(c), 117, 120-123, 132.) The Staff

27  obtained evidence supporting these allegations from documents VW produced in March 2016. The Staff did not know at that time, however, that VW MANAGER 1 was also responsible for

28  reviewing and approving certain sections of the bond offering memoranda. (*Id.* ¶ 169.) That information first came to light in February 2018, when VW produced the spreadsheets.

1  millions of pages of documents and arranging witness interviews and testimonies to discover

2  evidence of scienter (which defendants deny exists) takes considerable time. That it did so here is

3  neither unexpected, unusual, nor an indication that the Staff acted anything other than as

4  diligently as the circumstances allowed.

**III.**

**THE STAFF CONDUCTED A THOROUGH AND DILIGENT INVESTIGATION.**

5

6      The SEC's Division of Enforcement ("Enforcement Division") is responsible for

7  conducting investigations into possible violations of the federal securities laws.[2] At any given

8  time, Enforcement staff are conducting more than approximately 1500 investigations that vary in

9  size, complexity, and programmatic importance. The Enforcement Division has developed

10  certain general policies and procedures to guide the conduct of investigations by its staff. Many

11  of those policies and procedures are published in an Enforcement Manual, which can be found at

12  https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. A summary description of the

13  stages of a typical SEC investigation is attached hereto as Exhibit B.

14  A.      The ABS Investigation

15      Here, the Staff opened a Matter Under Inquiry ("MUI") for this investigation on

16  September 21, 2015—the first business day after publication of EPA's Notice of Violation to

17  VW on Friday, September 18, 2015.[3] (Ex. A ¶ 13.) On October 14, 2015, after a short period of

18  internal review of publicly-available information about VW and its securities offerings, the Staff

19

20  [2] "Congress has vested the SEC with broad authority to conduct investigations into possible
21  violations of the federal securities laws and to demand the production of evidence relevant to
such investigations." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 & n.8 (1984) (citing, as
22  examples, 15 U.S.C. §§ 77s(b), 78u(a), (b)). In so doing, Congress gave the SEC "considerable
discretion in determining when and how to investigate possible violations of the statutes
23  administered by the Commission." *Id.* at 745; *SEC v. Kaplan*, 397 F. Supp. 564, 569 (E.D.N.Y.
1975) ("It is well-established that the Securities and Exchange Commission … as a fact-finding
24  institution performs a vitally important function similar to that of a grand jury, 'the scope of
whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the
25  probable result of the investigation.'") (quoting *Woolley v. United States*, 97 F.2d 258, 262 (9th
26  Cir. 1938)).

27  [3] The purpose of opening a MUI is for the Staff to conduct a preliminary inquiry, on an informal
basis, to determine whether or not to open a formal investigation. During a MUI, the Staff does
28  not have authority to issue subpoenas or compel testimony from witnesses. (Ex. B at 1.)

1  converted the MUI into an investigation. (*See id.*)

2       On October 16, 2015, the Staff issued a voluntary request for information to VW, through

3  its counsel.[4] (*Id.* ¶ 14.) Among other things, the Staff's first request sought information about the

4  ABS VW offered and sold in the U.S. during the clean diesel scheme. (*Id.*) VW first began

5  supplying partial responses to this information request on December 9, 2015. (*Id.* ¶ 17.) VW

6  supplemented its responses on January 13, 21, and 25, 2016. (*Id.*)

7       The SEC issued a Formal Order of Investigation on January 14, 2016. (Ex. A ¶ 18.) The

8  Formal Order authorized the Staff to issue subpoenas for documents and witness testimony to

9  investigate whether VW had violated the federal securities laws. (Ex. B at 1.)

10      On January 26, 2016, after receiving the final responses to its October requests, the Staff

11 explained to VW's lawyers that the Staff planned to issue a subpoena for additional documents

12 and asked whether counsel would accept service of the subpoena. (Ex. A ¶ 19.) Counsel

13 requested that the Staff continue serving written requests for information instead of subpoenas

14 and represented that VW would voluntarily comply with the written requests.[5] (*Id.*)

15      Between October 2015 and June 2017, the Staff thoroughly investigated whether VW and

16 any of its officers or employees had violated the federal securities laws in connection with VW's

17 issuance of ABS in the United States. During this period, the Staff requested information about,

18

_____

19 [4] The Staff frequently requests that issuers and other parties produce documents and information
   voluntarily, which many are willing to do. This is especially true when the Staff opens an initial
20 inquiry, since Staff does not have the authority to issue subpoenas until the SEC issues a Formal
   Order of Investigation. (Ex. B at 1, 2.) In fact, even after a Formal Order is issued, it is not
21 uncommon for the Staff to make voluntary requests for documents and information instead of
   proceeding by subpoena, provided the party promises to produce the requested information in a
22 timely manner. In many cases, the use of voluntary requests may be more efficient for the Staff,
   particularly when the responding party is a foreign entity.
23

24 [5] After the May 10, 2019 initial status conference in this case, the press—relying on unnamed
   sources—reported that the SEC did not serve its first formal subpoena on VW until January
25 2017. (Shepardson, David *U.S. Judge Questions SEC on Delay in Filing Volkswagen Suit*,
   Reuters, 5/10/19, https://www.reuters.com/article/us-volkswagen-emissions-sec/u-s-judge-
26 questions-sec-on-delay-in-filing-volkswagen-suit-idUSKCN1SG28U). This is extremely
   misleading. Before January 2017, the Staff issued approximately eleven separate written
27 voluntary requests for documents and information to VW, which VW agreed to comply with.
   (*E.g.*, Ex. A ¶ 19.) The Staff eventually began issuing subpoenas in March 2017 due to the length
28 of time VW was taking to respond to the prior voluntary requests. (*See id.* ¶¶ 36, 48 and n.3.)

among other things, (i) whether "clean diesel" vehicle sales contracts or leases were included within the collateral pool supporting the ABS; (ii) the processes and procedures employed by VW in issuing the ABS; and (iii) whether persons responsible for preparing or approving the ABS offering documents knew about the clean diesel fraud. (*See*, *e.g.*, Ex. A ¶¶ 14, 20-24.) The Staff sent out over 20 written requests for information and subpoenas to VW and third parties, received and reviewed over 900,000 pages of documents, and interviewed or took the testimony of 9 witnesses. (*Id*. ¶ 49.)

Less than one year after it first opened its MUI, the Staff began exploring the possibility of resolving the matter with VW. (Ex. A ¶ 25.) In August 2016, the Staff scheduled a so-called reverse proffer presentation with VW's counsel. (*Id*.) At this presentation, which took place on September 8, 2016 in Chicago, the Staff summarized the evidence gathered to date concerning the ABS offerings and its theories of liability and outlined general terms for a potential settlement. (*Id*. ¶¶ 26-27.)

VW did not indicate an interest in engaging in settlement negotiations. (Ex. A ¶ 28.) To the contrary, VW's counsel said that VCI (the issuer of the ABS) wanted to submit a white paper responding to the Staff's presentation. (*Id*.) VCI submitted the white paper to the Staff five weeks later, on October 14, 2016. (*Id*. ¶ 31.) In it, VCI set forth its arguments against an SEC enforcement action based on the ABS. (*Id*.)

While the Staff was waiting for VCI's white paper, a representative from DOJ's Environment and Natural Resources Division emailed VW counsel and requested VW's consent to permit DOJ to share certain company financial information with the SEC that was necessary to facilitate global settlement discussions among the federal agencies and to allow all agencies to be in the same room with VW for settlement discussions. (Ex. A ¶ 30.) VW ultimately refused. (*Id*.) VW's counsel informed DOJ and the Staff that VW viewed the SEC's securities investigation differently than the other government investigations. (*Id*.) The global settlement negotiations proceeded without the SEC's participation. (*Id*.)

On November 14, 2016, approximately two months before VW's global settlement with other federal agencies, the Staff notified VW's counsel that it disagreed with the arguments in

7

1  VCI's white paper and that the Staff was continuing its investigation. (Ex. A ¶ 32.) Over the next

2  six months, the Staff continued its investigation of the ABS offerings. (*Id*. ¶¶ 34-44.)

3  B.    The Bond Investigation

4         In or about March 2017, the Staff learned that ABS offerings constituted less than half of

5  VCI's total funding and that VW, through different U.S. affiliates, had conducted multiple

6  private securities offerings in the U.S. during the relevant period, including selling certain

7  medium-term notes (*i.e.*, bonds) guaranteed by VWAG. (Ex. A ¶ 50.) Because the bonds were

8  sold in private offerings conducted pursuant to an exemption from the registration requirements

9  of federal law, the offerings were not required to be registered with the SEC. (*Id.*) The Staff

10 expanded its investigation to include private bonds issued by VWGoAF, a shell financing

11 subsidiary created by VWAG.[6] (*Id.* ¶ 52.) On April 18, 2017, the Staff served a written request

12 for documents/information to VW concerning these other offerings, including the bonds. (*Id.*) As

13 part of this request, the Staff asked that VW: "Identify the VW employees/corporate

14 representatives with the most knowledge of or involvement with" these securities. (*Id.*) As with

15 the ABS investigation, it was critical for the Staff to find out who was involved in preparing the

16 offering documents and whether they knew about the diesel emissions issues.

17        In May 2017, VW's counsel identified a senior manager in the Treasury Department for

18 Volkswagen Group of America ("VWGoA") as the employee who could best explain how the

19 bond offerings were prepared. (Ex. A ¶¶ 54-58.) The Staff took the witness's testimony in late

20 June 2017. (*Id.* ¶ 58.) He, however, did not know the answers to many of the most important

21 questions about the bond offerings, including:

22            •  Who was involved in providing the information that went into the bond
                 offering documents?
23
              •  Who approved the bond offering memorandum before it was issued?
24
              •  Did the process involve checklists or documents used to obtain approvals
25               from the various departments that worked on the bond offering memorandum?

26

27 [6] Although the private bondholders filed a securities class action lawsuit in June 2016, the Staff
   attorneys investigating this matter do not recall being aware of that suit before April 2017. (Ex.
28 A ¶ 50 n.6.)

- What processes or procedures existed for the drafting or the sources of information flowing into the offering memorandum?
- What departments or individuals were responsible for completing the underwriters' due diligence questionnaires? (*Id.*)

After the Treasury official's testimony, the Staff renewed its request for VW to identify the people and departments responsible for preparing the bond offering documents. (Ex. A ¶¶ 61-68.) On August 24, 2017, the Staff sent a letter to VW's counsel specifically asking, among other things:

- "Which people/departments/entities were involved in drafting the relevant documents?"
- "Is there any documentation that tracks who approved the documents and the date that they were approved?" (*Id.* ¶ 63.)

After multiple follow-up attempts to obtain the requested information, on October 6, 2017, the Staff identified four individuals from whom it wanted testimony, as well as ten individuals the Staff identified as involved in the bond offerings but sought clarification from VW of their roles to assess the need for testimony. (Ex. A ¶ 68) On October 30, 2017, VW's counsel identified four individuals with knowledge of the bond offering process and offered to make them available for testimony in London during the first week of December. (*Id.* ¶ 70.)

Staff attorneys traveled to London to take the testimony of these witnesses and one other witness during the week of December 4, 2017. (Ex. A ¶ 74.) During the testimonies, one witness revealed for the first time that VW created and maintained spreadsheets identifying VW employees and departments involved in preparing the bond offering documents. (*Id.* ¶ 75.) This was the very information the Staff explicitly requested in its August 24 letter and that it had been trying to discover since at least April, when it asked VW to identify the "employees/corporate representatives with the most knowledge of or involvement with the … bond offerings." (*Id.* ¶¶ 52, 63.) Following the testimonies, the Staff specifically requested copies of the spreadsheets in a letter sent to VW's counsel on December 15, 2017. (*Id.* ¶ 76.) VW did not produce the spreadsheets to the Staff until two months later, in February 2018. (*Id.* ¶ 78.)

While the Staff was pressing VW for information about who prepared the bond offering documents, the Staff continued its investigation. During 2017, the Staff sent out more than two

9

dozen written requests for information and subpoenas and interviewed or took the testimony of thirteen witnesses. VW produced over 1.6 million pages of documents. (*Id.* ¶ 72.)

During this phase of the investigation, the Staff also spent considerable effort and time trying to arrange the testimony or interview of the former CEO of VWGoA, who had moved back to Germany. (Ex. A ¶ 84.) The Staff contacted the former CEO's attorney in February 2017. (*Id.* ¶ 85.) On March 7, 2017, the attorney informed the Staff that his client would be willing to speak to the Staff and might be willing to come to the U.S. if DOJ guaranteed he would not be arrested if he came to the U.S. (*Id.*) Over the next several months, the Staff worked to secure a commitment from DOJ to provide a safe-passage letter. On September 14, 2017, DOJ confirmed it would grant safe-passage to the former CEO. (*Id.* ¶¶ 86-87.) The Staff repeatedly followed up with the witness's attorney in an attempt to arrange his interview in the U.S. (*Id.*) Eventually, on October 29, 2017, the attorney sent the Staff an email stating that his client would not agree to an interview because of ongoing VW criminal and civil proceedings and that he was not authorized to accept service of a subpoena. (*Id.*)

After the Staff's unsuccessful attempt to arrange an interview of the former CEO of VWGoA, it sought the assistance of the German Federal Financial Supervisory Authority (German Bundesanstalt für Finanzdienstleistungsaufsicht ("BaFin")) in obtaining documents and interviews of this and other former VW senior officials located in Germany, including Mr. Winterkorn. (Ex. A ¶ 88.) The SEC's Office of International Affairs submitted a formal request for assistance to BaFin on January 31, 2018. (*Id.* ¶ 90.) After a lengthy wait, BaFin notified the Staff on July 6, 2018, that it could not assist in setting up the interviews. (*Id.* ¶ 93.) The Staff then sought the assistance of the Department of Justice to arrange the interviews through a Mutual Legal Assistance Treaty with Germany, but DOJ ultimately declined that request. (*Id.*)

Later, in November and December 2018, the Staff spoke with a U.S.-based attorney for a former VW employee who had knowledge of VW's defeat device and who claimed to have had interactions with Mr. Winterkorn on the subject. (Ex. A ¶¶ 117-18.) The attorney said the witness, who was in Germany, was willing to talk to the Staff but needed to first get VW's consent. (*Id.* ¶ 118.) On January 8, 2019, a Staff supervisor, who was permitted to work during

10

1  the shutdown, emailed VW's counsel to see if VW would consent to the witness's request to

2  speak with the Staff. (*Id.* ¶ 119.) On January 18, 2019, VW's counsel informed the Staff

3  supervisor that VW did not object to the witness speaking to the Staff, but VW would not pay the

4  witness's attorney's fees. (*Id.* ¶ 120.) The witness's attorney later confirmed that, although VW

5  had been covering the witness's attorney's fees up to that point pursuant to an indemnification

6  agreement, VW refused to do so in connection with an interview by the Staff. (*Id.* ¶ 121.) After

7  the government reopened following the shutdown, the Staff was able to obtain a declaration from

8  the witness on March 13, 2019, by communicating through the witness's U.S. attorney. (*Id.* ¶¶

9  122-23.)

10  C.     The Wells Process[7]

11        Sensitive to the tension between gathering as much evidence as possible and the

12  detriment of further delay, on June 28, 2018, the Staff issued Wells notices to VWAG,

13  VWGoAF, and VCI asking for Wells submissions to be submitted by July 19, 2018. (Ex. A ¶

14  99.) In response, VW's counsel requested a meeting to discuss the Staff's theories of liability.

15  (*Id.* ¶ 100.) On July 2, 2018, the Staff laid out its legal theories and potential charges to VW's

16  counsel. (*Id.*) During that meeting, VW's counsel requested additional time to prepare their

17  Wells submissions, and the Staff extended the deadline to July 26, 2018. (*Id.*)

18        VW's counsel subsequently requested a further extension. (Ex. A ¶ 101.) In a letter to

19  Staff dated July 5, 2018, counsel sought to push back VW's Wells submissions until September

20  7, 2018, citing a variety of factors for the additional extension including the need for more time

21  "to review thoroughly the extensive record" and to retain experts to review the Staff's remedies

22  theories. (*Id.*) Counsel also proposed scheduling a meeting with one of the Co-Directors of the

23  Enforcement Division ("Co-Director") for a date after its Wells submission. (*Id.*) (The Co-

24

25  [7] The SEC created the Wells process in 1972. As part of the Wells process—named after the
     attorney who chaired the committee that recommended its adoption—the Staff notifies a
26  prospective defendant of the substance of the charges it intends to recommend to the
     Commission. The prospective defendant may submit a written statement responding to the
27  charges. In many instances, the prospective defendant is also given the opportunity to meet with
     senior officials at the SEC. If the Staff decides to proceed with its recommendation, it will
28  forward the Wells response to the Commissioners with the recommendation. (Ex. B at 3.)

Directors oversee the SEC's national enforcement program and supervise all investigations and civil enforcement proceedings brought by the Enforcement Staff.)

After further negotiation, the parties eventually agreed that VW would provide the Staff with its primary Wells submissions on August 3, with the right to submit a supplemental expert report by August 17. (Ex. A ¶ 102.) VW's counsel had two Wells meetings with the Co-Director, on August 8 and 23. (*Id.* ¶¶ 102, 103, 109.)

Beginning on August 4, 2018, and continuing through September 21, 2018, VW made multiple lengthy Wells submissions, totaling over 3500 pages:

- On August 4, 2018, VWAG and VWGoAF made a joint Wells submission of 87 pages, plus over 2300 pages of exhibits. VCI made a separate Wells submission of 36 pages, plus over 1100 pages of exhibits. (Ex. A ¶ 105.)

- On August 18, 2018, VWAG, VWGoAF, and VCI made a joint supplemental Wells submission of 60 pages, plus a 38-page expert declaration. (*Id.* ¶ 108.)

- On September 21, 2018, VWAG, VWGoAF, and VCI made a joint second supplemental Wells submission of 19 pages, plus a 49-page appendix. (*Id.*¶ 111.)

During the first Wells meeting on August 8, VW's counsel suggested the Staff had more fact-finding to do and should talk to Mr. Winterkorn and other witnesses in Germany before deciding to recommend an enforcement action against VW. (Ex. A ¶ 106.) At that meeting, as well as the August 23 Wells meeting with the Co-Director, counsel offered to help the Staff arrange an interview of Mr. Winterkorn, who was in Germany. (*Id.*) In September 2018, the Staff attempted unsuccessfully to arrange an interview of Mr. Winterkorn through Mr. Winterkorn's U.S.-based attorneys.[8] (*See id.* ¶¶ 96-98.) The parties could not reach agreement on a format for the interview of Mr. Winterkorn. (*Id.*) The Staff issued a Wells notice to Mr. Winterkorn on October 2, 2018. (*Id.* ¶ 112.) On November 2, 2018, Mr. Winterkorn made a Wells submission of 51 pages, totaling over 300 pages with exhibits. (*Id.* ¶ 113.) A Wells meeting was held with Mr. Winterkorn's counsel and the Co-Director on November 30, 2018. *(Id.*¶ 114.)

---

[8] DOJ indicted Mr. Winterkorn on March 14, 2018, which indictment remained under seal until May 3, 2018. (Ex. A ¶ 106.) German prosecutors criminally charged him on or about April 15, 2019. (*Id.*)

1    After the conclusion of the Wells process, the Staff moved forward with its

2 recommendation and sought the Commission's approval to file an enforcement action.[9] (Ex. A ¶¶

3 125-27.) The Commission approval process was interrupted by the five-week government

4 shutdown, which lasted until January 25, 2019. (*Id*.) After the government reopened, the

5 approval process was completed and the Commissioners authorized the filing of this enforcement

6 action on February 28, 2019. (*Id*.)

7    The complaint was filed on March 14, 2019. (Ex. A. ¶ 127.)

8                                    **IV.**

9            **THE SEC ACTED EQUITABLY IN PURSUING THIS INVESTIGATION.**

10    Implicit in the Court's request for this submission is the question of why the SEC's

11 complaint followed so long after VW settled with other government agencies, such as the

12 Department of Justice's Criminal and Civil Divisions, the Environmental Protection Agency, and

13 the Federal Trade Commission. The SEC was willing to resolve its investigation in 2016, either

14 as part of the global settlement negotiations with other federal agencies or directly with VW.

15 VW—understanding that the SEC Staff would otherwise continue its investigation—elected not

16 to engage in settlement discussions with the SEC at that time (as was its right). The Staff,

17 therefore, worked diligently to complete its investigation into whether VW violated the federal

18 securities laws. The ABS part of the investigation was mostly complete by March 2017, two

19 months after DOJ's settlement with VW was made public in January 2017. The continued

20 investigation of the ABS issues led to the bond part of the investigation, which took

21 approximately fifteen months to complete. Following the completion of the entire investigation,

22 the Staff gave VW, Mr. Winterkorn, and their counsel an extensive opportunity to present VW's

23 arguments to SEC senior officers and to engage in settlement discussions before the matter was

24 presented to the Commission for consideration and approval (following the government

25

26 [9] Only the SEC's Commissioners can authorize the filing of a complaint. To get their approval, the Staff must prepare and submit a recommendation to the Commissioners. The recommendation is a formal, comprehensive memorandum discussing, among other things, the

27 relevant facts discovered during the investigation, the applicable law, any Wells submissions, and the Staff's recommendation to the Commissioners. (*See* Ex. B at 3-4.)

28

13

1  shutdown). After the Commission approved the action, the case was timely filed within the

2  applicable statute of limitations.[10]

3         There are strong policy reasons for the SEC to have continued investigating and to have

4  filed this contested case, despite VW's earlier settlements with other federal agencies in 2017.

5  For nearly a decade, VW and its affiliates were selling, through a syndicate of U.S. banks,

6  billions of dollars in ABS and bonds to U.S. investors without disclosing the emissions cheating

7  scheme affecting nearly every diesel vehicle VW sold in the United States after 2008 and over 11

8  million sold worldwide. The automobile ABS market is one of the largest ABS markets in the

9  United States. The 144A corporate bond market is a hundred-billion dollar market. During the

10  underwriting process for both ABS and bond offerings, the U.S. banks asked the right questions

11  seeking to ferret out any undisclosed facts that would be material to investors looking to

12  purchase VW's securities. VW, however, repeatedly gave false and/or misleading responses to

13  many of their questions. VW continues to assert that it has no liability to the purchasers of its

14  bonds.[11]

15         Moreover, unlike the private bondholder's putative class action, which must rely solely

16  on representations made directly to the bondholders by VW, the SEC's enforcement action can

17

18  [10] A five year statute of limitations applies to the Commission's claims for disgorgement and
    civil penalties. *See* 28 U.S.C. § 2462 (five-year statute of limitations for "any action, suit or
19  proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise");
    *see also Kokesh v. SEC*, 137 S.Ct. 1635, 1639 (2017) (holding § 2462 applies to SEC's claims
20  for disgorgement). Moreover, because the SEC acts not as an ordinary plaintiff, but as an agency
    of the United States charged by Congress with enforcing the federal securities laws, it is not
21  subject to the same equitable defenses that may apply to suits by private plaintiffs. *See United
    States v. Summerlin*, 310 U.S. 414, 416 (1940) (laches does not apply to claims brought by the
22  United States); *SEC v. Gulf & Western Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980) ("A
    claim of laches also cannot be applied to a government agency working in the public interest.
23  Here, the length of the investigation is a reflection of the complexity of the fact pattern and does
24  not support a laches defense.") (Internal cites omitted); *SEC v. Cuban*, 798 F. Supp. 2d 783, 794
25  (N.D. Tex. 2011) (SEC actions are not subject to same defenses as apply to private litigants).

26  [11] As part of its settlement with DOJ, VW agreed to pay a $50 million civil penalty to settle
    claims that it violated the Financial Institutions Reform, Recovery, and Enforcement Act of
27  1989, by making misrepresentations to financial institutions in connection with VW's ABS
    offerings. To the Staff's knowledge, that money was paid to the United States Treasury and not
28  to purchasers of its ABS.

14

charge VW for misleading the underwriters. This is true regardless of whether the underwriters ultimately suffered any financial losses in the transactions or even made money when the securities ended up being sold to investors. The integrity of the market was damaged by VW's conduct. And it will continue to be damaged if issuers are permitted to sell billions of dollars in securities in the United States based on false or misleading information. Following the public disclosure of VW's fraud, the value of its bonds fell in secondary market trading. By September 22, 2015, the price of the bonds plummeted, falling by more than 7% of par value in some cases. VW did not conduct any new bond offerings in the United States for over three years. After a three-year hiatus, VW conducted another multi-billion dollar bond offering in the United States in November 2018. (*See* Compl. ¶¶ 21, 153, 180.)

In sum, the speed with which the Staff conducts and completes any investigation is not dependent solely on the SEC. Rather, it is influenced by many factors over which the Staff has little or no control. Those factors include: (a) the number, size, and complexity of the offerings being investigated; (b) the period of time over which the offerings were conducted; (c) the location of relevant witness and documents; (d) whether the facts are contested; (e) whether there are parallel criminal investigations; and (f) the willingness of the parties and witnesses to cooperate with the investigation. The length of the SEC's investigation here was affected by all these factors, including delays by VW in providing documents and information to the Staff.

The Staff worked hard and as quickly as possible, under very difficult circumstances, to complete an investigation into numerous different securities offerings conducted by a foreign company and three of its affiliates over many years. The Staff treated VW fairly and afforded the company full process throughout its investigation. In doing so, the Staff acted not only diligently but equitably in conducting and completing its investigation.

Dated:  July 8, 2019

Respectfully submitted,

/s/Daniel J. Hayes
Daniel J. Hayes
U.S. Securities and Exchange Commission

Memorandum Concerning SEC's Volkswagen Investigation        Case No. 3:19-cv-01391-CRB