Daniel J. Hayes
Jake A. Schmidt
Kevin A. Wisniewski
Michael D. Foster
U.S. SECURITIES & EXCHANGE
COMMISSION
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-3368
Facsimile: (312) 353-7398

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 2672 CRB (JSC) |
| | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO VW DEFENDANTS' MOTION TO DISMISS** |
| This Document Relates To: | Date:        August 14, 2020 |
| *U.S. S.E.C. v. Volkswagen AG,* No. 3:19-cv-1391-CRB | Time:        10:00 a.m. |
| | Courtroom:   6, 17th Floor |
| | Judge:       The Honorable Charles R. Breyer |

## <u>TABLE OF CONTENTS</u>

**MEMORANDUM OF POINTS AND AUTHORITIES**……………………..…………1

**STATEMENT OF ISSUES TO BE DECIDED**……………………………………...1

**SUMMARY OF ARGUMENT**……………………………………………………2

    The ABS………………………………………………………………………...2

    The 144A Bonds………………………………………………………………...4

    Injunction and Disgorgement…………………………………………………...5

**BACKGROUND**…………………………………………………………………6

    Brief Summary…………………………………………………………………6

    Winterkorn's Strategy 2018……………………………………………………6

    VW's Defeat Device Scheme…………………………………………………6

    VW's ICCT Task Force………………………………………………………6

    VW Proposes a Sham Recall…………………………………………………8

    VW's Fraud is Discovered……………………………………………………8

    VW's 144A Bond Offerings…………………………………………………8

    VW's ABS……………………………………………………………………..10

    The False and Misleading ABS Offering Documents…………………………11

**RULE 12(B)(6) Legal Standard**…………………………………………………...12

**ARGUMENT**……………………………………………………………………13

    I.      DOJ Did Not Release The SEC's Claims…………………………………...13

          A.  DOJ Could Not Unilaterally Release the SEC's Civil Claims Against VCI...…13

          B.  The Language of the FIRREA Settlement Does Not Release the SEC's

             Claims…………………………………………………………………...16

i

II.   The SEC's Complaint Properly Alleges VCI Violated Sections 17(a)(2) and (a)(3) of the Securities Act………………………………………………………………18

    A.  VCI Made False and Misleading Statements and Omissions to Underwriters and Investors………………………………………………………………18

        1. VCI Made False and Misleading Statements in the Offering Documents………………………………………………………………18

        2. VCI Failed to Disclose the "Principal Material Risks" of the Private ABS……………………………………………………………...21

    B.  VCI Acted *At Least* Negligently……………………………………………...21

    C.  The Complaint Adequately Alleges VCI Engaged in Misconduct "Which Operates as a Fraud or Deceit Upon Purchasers" of its ABS…………………...23

III.  VW's Misleading Risk Disclosures in Bond Offering Memos are Actionable……..26

IV.  VW's Misleading Financial Statements Included with the May 23, 2014 Bond Offering Are Actionable Under Section 17(a)(2)…………………………………...30

V.   The Court Should Not Dismiss Any of the  SEC's Prayers for Relief ….……31

    A.  VW's Request to Strike the Prayer for Injunctive Relief is Premature…………31

    B.  The Court Also Should Not Dismiss the Complaint's Prayer for Disgorgement…………………………………………………………………34

**CONCLUSION**………………………………………………………………36

**Table of Authorities**

*Cases*                                                                                                                          **Page(s)**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ................................................................................ 24, 25

*Asarco, LLC v. Union Pacific R.R. Co.,*
    765 F.3d 999 (9th Cir. 2014) ..................................................................... 3, 16

*Bruton v. Gerber Products Company,*
    2018 WL 4181903 (N.D. Cal. Aug. 31, 2018) ............................................. 35

*Comptroller of Currency v. Lance,*
    632 F. Supp. 437 (N.D. Ga. 1986) .............................................................. 13

*Dolphin & Bradbury, Inc. v. SEC,*
    512 F.3d 634 (D.C. Cir. 2008) ................................................................... 4, 26

*Erler v. Erler,*
    2018 WL 3421911 (N.D. Cal. July 16, 2018) ............................................. 18

*FDIC v. Irwin,*
    727 F. Supp. 1073 (N.D. Tex. 1989) ........................................................... 14

*Gabelli v. SEC,*
    133 S. Ct. 1216 (2013) ............................................................................... 32

*Gebhart v. SEC,*
    595 F.3d 1034 (9th Cir. 2010) ............................................................... 12, 23

*Gonzales v. Citimortgage, Inc.,*
    2015 WL 3505533 (N.D. Cal. June 3, 2015) .............................................. 35

*Hateley v. SEC,*
    8 F.3d 653 (9th Cir. 1993) ......................................................................... 35

*In re Anthony Fields,*
    2015 WL 728005 (Comm'n Op. Feb. 20, 2015) ......................................... 21

*In re Countrywide Fin. Corp. Sec. Litigation,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................. 19, 20

*In re Cutera Sec. Litigation,*
    610 F.3d 1103 (9th Cir. 2010) ................................................................... 29

*In re Harman Intern. Indus., Inc. Sec. Litigation,*
    791 F.3d 90 (D.C. Cir. 2015) ...................................................................... 4

*In re Level 3 Communications, Inc. Sec. Litigation,*
    667 F.3d 1331 (10th Cir. 2012) ................................................................. 29

*In re Marion Merrell Dow, Inc.*,
    1993 WL 393810 (W.D. Mo. Oct. 4, 1993) ......................................................... 26

*In re United States District Court*,
    791 F.3d 945 (9th Cir. 2015) .......................................................................... 15

*In re Van der Moolen Holding N.V. Secs. Litigation*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................... 26

*In Re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Product Liability Litigation*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017) ....................................... 11-12, 25, 30

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    398 F. Supp. 3d 549 (N.D. Cal. 2019) ............................................................... 29

*Johnson v. SEC*,
    87 F.3d 484 (D. D.C. 1996) ............................................................................. 33

*Jones v. SEC*,
    298 U.S. 1 (1936) ......................................................................................... 15

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal Apr. 27, 2017) ...................................................... 29

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ........................................................................ 3, 23, 24-25

*Malouf v. SEC*,
    933 F.3d 1248 (10th Cir. 2019) .................................................................. 4, 24, 25

*Margalli-Olvera v. INS*,
    43 F.3d 345 (8th Cir. 1994) ............................................................................. 15

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) .............................................................. 29

*Menkes v. Stolt-Nielsen S.A.*,
    2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...................................................... 29

*Meyer v. Jinkosolar Holdings. Co.*,
    761 F.3d 245 (2d Cir. 2014) ............................................................................ 26

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ............................................................................. 4

*SEC v. Am. Realty Trust*,
    586 F.2d 1001 (4th Cir. 1978) .......................................................................... 31

*SEC v. Am. Bd. of Trade, Inc.*,
    751 F.2d 529 (2d Cir. 1984) ............................................................................ 33

*SEC v. Banc De Binary Ltd.*,
  2014 WL 2197740 (D. Nev. May 27, 2014) ...................................................... 15

*SEC v. Berry*,
  2006 WL 6382128, at *11 (N.D. Cal. Oct. 3, 2019)........................................... 35

*SEC v. Blockvest, LLC*,
  2018 WL 4955837 (S.D. Cal. Oct. 5, 2018) .............................................. 21, 30

*SEC v. Cole*,
  2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ...................................... *passim*

*SEC v. Credit Bancorp, Ltd.*,
  738 F. Supp. 2d 376 (S.D.N.Y. 2010) ................................................................ 35

*SEC v. Dain Rauscher, Inc.*,
  254 F.3d 852 (9th Cir. 2001) ............................................................... *passim*

*SEC v. Drake*,
  2017 WL 6507766 (C.D. Cal. Dec. 18, 2017) .................................................... 33

*SEC v. Duncan*,
  2009 WL 10670521 (C.D. Cal. July 6, 2009) .............................................. 3, 22

*SEC v. Durham*,
  2017 WL 3581640 (S.D. Ind. Aug. 18, 2017) .................................................... 35

*SEC v. Dynkowski*,
  2015 WL 12851237 (D. Del. July 29, 2015) ...................................................... 33

*SEC v. Fed. Labor Rel. Auth.*,
  568 F.3d 990 (D.C. Cir. 2009) ........................................................................... 15

*SEC v. Gabelli*,
  518 F. App'x 32 (2d Cir. 2013) ......................................................................... 32

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) ........................................................................... 5, 32

*SEC v. Gentile*,
  939 F.3d 549 (3d Cir. 2019) ..................................................................... 5, 32-33

*SEC v. Guardian Oil & Gas, Inc.*,
  2014 WL 7330451 (N.D. Tex. Dec. 23, 2014) .............................................. 22, 32

*SEC v. Hilsenrath*,
  2008 WL 2225709 (N.D. Cal. May 29, 2008) ................................................... 12

*SEC v. JT Wallenbrock & Assoc.*,
  440 F.3d 1109 (9th Cir. 2006) .......................................................................... 34

*SEC v. Kameli,*
   2020 WL 2542154 (N.D. Ill. May 19, 2020) ........................................................ 25, 33

*SEC v. Liu,*
   754 F. App'x 505 (9th Cir. 2018) ............................................................... *passim*
   cert. granted 140 S. Ct. 451 (2019)

*SEC v. Mapp,*
   240 F. Supp. 3d 569 (E.D. Tex. 2017) .................................................................. 25

*SEC v. Melvin,*
   2013 WL 12062834 (N.D. Ga. June 26, 2013) ...................................................... 33

*SEC v. Monarch Funding Corp.,*
   1996 WL 348209 (S.D.N.Y. June 24, 1996) .......................................................... 35

*SEC v. Morgan Keegan & Co., Inc.,*
   678 F.3d 1233 (11th Cir. 2012) .......................................................................... 12

*SEC v. Pace,*
   173 F. Supp. 2d 30 (D.D.C. 2001) ...................................................................... 35

*SEC v. Paradyne Corp.,*
   1985 WL 5839 (M.D. Fla. Aug. 14, 1985) .................................................... 3, 14-15

*SEC v. Pocklington,*
   2018 WL 6843665 (C.D. Cal. Nov. 29, 2018) ............................................. 4, 24, 25

*SEC v. Rana Research,*
   8 F.3d 1358 (9th Cir. 1993) ................................................................................ 12

*SEC v. Robert Collier & Co.,*
   76 F.2d 939 (2d Cir. 1935) ........................................................................ *passim*

*SEC v. Sablhok,*
   2009 WL 10690310 (N.D. Cal. Feb. 18, 2009) ..................................................... 12

*SEC v. Sells,*
   2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ...................................................... 12

*SEC v. Shanahan,*
   2010 WL 173819 (D. Minn. Jan. 13, 2010) .......................................................... 33

*SEC v. Steadman,*
   967 F.2d 636 (D.C. Cir. 1992) ........................................................................ 5, 31

*SEC v. Tecumseh Holdings. Corp.,*
   765 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................. 26

*SEC v. Ustian,*
   2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) .................................................... 4, 26

*SEC v. Victorville*,
    2014 WL 12588688 (C.D. Cal. Oct. 14, 2014) .......................................... 35

*SEC v. Wayland*,
    2019 WL 2620669 (C.D. Cal. Apr. 8, 2019) ...................................... 18, 22

*SEC v. Wheeler*,
    56 F. Supp. 3d 241 (W.D.N.Y. 2014) ..................................................... 33

*Silverstrand Investments v. AMAG Pharms. Inc.*,
    707 F.3d 95 (1st Cir. 2013) .................................................................... 19

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) .................................................................... 29

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
    771 F. App'x 494 (2d Cir. 2019) .......................................................... 29

*United States v. Harvey*,
    791 F.2d 294 (4th Cir. 1984) ................................................................. 15

*United States v. Hercules, Inc.*,
    961 F.2d 796 (8th Cir. 1992) ................................................................. 13

*United States v. Naftalin*,
    441 U.S. 768 (1979) .............................................................................. 23

*United States v. Rodriguez*,
    2007 WL 2778917 (N.D. Cal. Sept. 21, 2007) ...................................... 18

*United States v. Rourke*,
    74 F.3d 802 (7th Cir. 1996) ................................................................... 15

### *Statutes and Rules*

15 U.S.C § 17 ............................................................................................... 18

15 U.S.C § 17(a)(2) ................................................................................. 3, 18

15 U.S.C § 17(a)(3) ........................................................................... 3, 18, 23

15 U.S.C § 20(b) .......................................................................................... 14

15 U.S.C § 21(d)(1) ..................................................................................... 14

28 U.S.C. § 516 ...................................................................................... 13-14

17 C.F.R. §200.1 .......................................................................................... 15

17 C.F.R. § 202.5(b) .................................................................................... 17

17 C.F.R. § 229.503(c) ........................................................................... 11, 19

17 C.F.R. § 1104(c) ............................................................................................... 11, 19

17 C.F.R. § 1111 .................................................................................................... 11, 19

28 C.F.R. § 0.45 .................................................................................................... 13, 16

***Other***

Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1255………………...31, 32

Division of Enforcement 2019 Annual Report at 14-17, https://www.sec.gov/files/enforcement-annual-report-2019.pdf...........................................................................................................17

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Securities and Exchange Commission submits this Memorandum of Points and Authorities in support of its opposition to the motion to dismiss filed by the VW Defendants (Dkt. 734).

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether the Department of Justice could and did release the SEC's civil claims against VCI, arising under the Securities Act of 1933 ("Securities Act"), as part of its FIRREA Settlement Agreement with VW, which did not include the SEC as a party or make any reference to the SEC or the federal securities laws?

2.      Whether the SEC's complaint adequately pleads that VCI at least negligently violated Sections 17(a)(2) and (a)(3) of the Securities Act by omitting from its public ABS Prospectuses information about its on-going defeat device fraud and government investigations that Regulation AB required it to disclose?

3.      Whether the SEC's complaint properly alleges that VCI at least negligently violated Sections 17(a)(2) and (a)(3) of the Securities Act by representing in its private ABS Offering Memorandum that it had disclosed the "principal material risks" of the offering but failing to disclose any facts related to the on-going defeat device fraud and government investigations?

4.      Whether the SEC's complaint properly alleges that VW at least negligently violated Section 17(a)(2) of the Securities Act by distributing financial statements with its May 23, 2014 144A Bond offering that failed to properly account for the over $21 billion in potential liability VW calculated it was facing as a result of the on-going defeat device fraud and government investigations?

5.      Whether certain risk disclosures in VW's 144A Bond Offering Memorandum—which warned only about the theoretical possibility that VW's cars may contain defects and that it may have to conduct a recall if unknown defects were later discovered—were actionably false or misleading, when viewed in context with VW's other statements, because VW failed to disclose any information about the defeat device fraud and government investigations that had already materialized?

6.      Whether the complaint's prayers for injunctive relief and disgorgement should be dismissed at the pleading stage, even though VW concedes that the complaint properly states claims that VW violated the federal securities laws?

## SUMMARY OF ARGUMENT

VW moves to dismiss some, but not all, of the SEC's claims. For example, VW does not contest that the SEC has properly alleged fraud claims for the misstatements and omissions made in responses to the Underwriters' Due Diligence Questionnaires ("DDQs") or in the 144A Bond Subscription Agreements. And, with the exception of the financial statements included with the May 23, 2014 Bond Offering Memoranda and certain "risk factor" disclosures repeated in all three 144A Bond Offering Memoranda, VW does not challenge any of the other charged misrepresentations or omissions made in those documents. Thus, VW acknowledges that the SEC's complaint pleads that they made, with scienter, material misrepresentations and omissions in connection with the sale of billions of dollars in securities in the U.S.[1]

Instead, VW attacks the complaint as "piling on" and, without explanation, as "unprecedented." Although neither accusation is accurate, they both are irrelevant to a motion to dismiss filed pursuant to Rule 12(b)(6), particularly where the motion concedes the complaint adequately pleads multiple claims for relief. What is unprecedented, however, is VW's argument that the Department of Justice ("DOJ") had actual authority to—and in fact did—release the SEC's civil securities law claims against VCI without the SEC's consent. It could not and did not release the SEC's civil securities law claims.

VW's motion should be denied in its entirety.

**The ABS.**  *First*, DOJ could not unilaterally release the SEC's civil securities fraud claims against VCI without the SEC's consent. (VW Mot. at 5-6, 19-21.) The SEC is an independent agency of the federal government, and Congress gave it "complete autonomy" over the civil securities law claims asserted in this case. *SEC v. Robert Collier & Co.*, 76 F.2d 939, 940 (2d Cir.

---

[1] At various points in its motion, VW asserts its intention to preserve certain arguments it made and the Court rejected in the related private bondholder and ADR litigation. Nevertheless, VW does not substantively re-argue those points here.

1935) (Hand, L.); *SEC v. Paradyne Corp*., 1985 WL 5839, at *1 (M.D. Fla. Aug. 14, 1985) (Congress authorized the SEC "to litigate its own civil cases"). Moreover, there is no evidence that DOJ "unambiguously released" the SEC's claims in its FIRREA Settlement with VW, which makes no reference *at all* to the SEC or the federal securities laws. *See Asarco, LLC v. Union Pacific R.R. Co.*, 765 F.3d 999, 1010 (9th Cir. 2014) (interpretation of settlement agreement, which did not "unambiguously release" plaintiff's claims, could not be resolved at motion to dismiss stage).

    ***Second***, the SEC properly pleads VCI violated Securities Act Sections 17(a)(2) and (a)(3) of the Securities Act by making actionable misrepresentations and omissions in the ABS offering documents. (VW Mot. at 6-7, 22-27.) Although Regulation AB did not require VCI to inspect every car looking for defects (*id.* at 22), it did require VCI to disclose the "most significant" risks for its public ABS offerings and all information that could be material to the "performance of the [ABS] asset pool." (Compl. ¶ 234.) VW's widespread emissions violations fit squarely within both categories and needed to be disclosed. (*Id.* ¶¶ 232, 236.) ***Moreover***, the Offering Memorandum for VCI's private ABS was also misleading for failing to disclose that information. VCI affirmatively represented that it had disclosed the "principal material risks" of the offering (*id.* ¶ 240); yet, it completely omitted any mention of the emissions violations affecting a substantial portion of the cars tied to the ABS asset pool. (*Id.* ¶¶ 99(g), (p) and (q), 114, 124.)

    ***Third***, the complaint properly alleges VCI violated Sections 17(a)(2) and (a)(3) by acting ***at least*** negligently. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (fact questions existed over whether defendant acted negligently or recklessly by not investigating whether statements made in offering materials were accurate). That VCI may also have acted with scienter, as VW seems to suggest (VW Mot. at 27-31.), is no defense. *SEC v. Duncan*, 2009 WL 10670521, at *11 (C.D. Cal. July 6, 2009) (reckless conduct "is more than sufficient to satisfy the negligence standard required to violate Section 17(a)(2) and (3)").

    ***Fourth***, the SEC need not allege "deceptive conduct" ***in addition to*** misstatements in order to plead a violation of Section 17(a)(3), which prohibits conduct "[that] operates or would operate as a fraud or deceit upon the purchaser." Misleading statements or omissions by themselves are enough. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019) (rejecting argument that Rule 10b-

1   5(c)—which contains nearly identical language to Section 17(a)(3) of Securities Act—requires

2   "conduct other than misstatements"); *Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019)

3   (applying *Lorenzo* to Section 17(a)(3)).  **And since** "Section 17(a)(3) permits negligent violations,"

4   there is no need to show that defendant's "principal <u>purpose</u>" was "creating a false appearance of

5   fact." *SEC v. Pocklington*, 2018 WL 6843665, at *9 (C.D. Cal. Nov. 29, 2018) (emph. in orig.)

6   (quote omitted). Rather, it is sufficient that a "defendant's negligent conduct has the effect of

7   creating a false appearance of fact." *Id*. Here, the SEC pleads VCI at least negligently misled

8   investors by repeatedly disseminating false and misleading statements to them without first

9   investigating whether or not the statements were true and complete. (Compl. ¶¶ 252-54, 271). *Dain*

10  *Rauscher*, 254 F.3d at 856.

11          <u>**The 144A Bonds.**</u>  ***First***, VW wrongly argues that its misleading "risk factor" disclosures

12  are not actionable as a matter of law. (VW Mot. at 8-9, 31-35.) Like other misleading statements,

13  risk factor disclosures ***are*** actionably misleading where, when viewed in context, they leave

14  investors with the false impression that the stated risks are just theoretical possibilities despite fact

15  those risks have already begun to materialize. *See SEC v. Ustian*, 2019 WL 7486835, at *32-*33

16  (N.D. Ill. Dec. 13, 2019) (question of fact existed as to whether risk factor warning of possibility

17  that EPA might not approve engine "mischaracterized that risk" given negative feedback Navistar

18  had already received from EPA); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir.

19  2008) (Bradbury's "[c]autionary words about future risk cannot insulate from liability the failure to

20  disclose that the risk" had already "transpired.") (*citing Rombach v. Chang*, 355 F.3d 164, 173 (2d

21  Cir.2004).). VW's risk disclosures told 144A Bond investors and Underwriters only that it was

22  possible some unknown "defects" may exist in its cars and that authorities could someday ask VW

23  to conduct a "recall," despite the fact VW already knew its cars were defective, could not be fixed,

24  and would probably need to be recalled. (Compl. ¶ 175.) *See In re Harman Intern. Indus., Inc. Sec.*

25  *Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (risk disclosures that warn of a "potential risk, but impl[y]

26  that no such problems were on the horizon [though] a precipice was in sight" are misleading).

27          ***Second***, VW negligently violated Section 17(a)(2) of the Securities Act by including its

28  misleading financial statements with the May 23, 2014 Offering Memorandum. Weeks before the

document was sent to investors, VW's senior officials and lawyers knew about the widespread emissions issues, government investigations, and devastating financial exposure. (Compl. ¶¶ 92-97, 98(f), 102-112, 165-168, 185; *see also* VW Mot. at 34: "the SEC does not allege that Winterkorn learned of any government investigations and resulting financial consequences before April 29, 2014.") VW ***should have*** ensured that this critical information was given to VWAG's accounting department or otherwise reflected in its financial statements, but it did not. That is at least negligence. *See SEC v. Steadman*, 967 F.2d 636, 643-45 (D.C. Cir. 1992) (mutual funds negligently violated federal securities laws by omitting from financial statements potential liability for violating state registration requirement for 17 years); *SEC v. Cole*, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (negligence includes "failing to do something that a reasonably careful person would do under like circumstances") (quote and cite omitted).

**Injunction and Disgorgement.**  Where, as here, the SEC adequately pleads VW violated the securities laws and was unjustly enriched by doing so, the complaint's prayers for injunctive relief and disgorgement cannot be dismissed at the pleading stage. *SEC v. Gentile*, 939 F.3d 549, 564 (3d Cir. 2019) (*cert. denied* April 20, 2020) (reversing dismissal of prayer for injunction); *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (same), *rev'd on other grounds,* 133 S. Ct. 1216 (2013); *see SEC v. Liu*, 754 F. App'x 505 (9th Cir. 2018), *cert. granted* 140 S. Ct. 451 (2019) (SEC is entitled to seek disgorgement).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## BACKGROUND

**Brief Summary.**  VW—through its CEO Martin Winterkorn and other senior officials—perpetrated a massive fraud on U.S investors, consumers, and government regulators as part of an illegal scheme to sell its purportedly "clean diesel" cars and billions of dollars of corporate bonds and asset-backed securities in the United States. (Compl. ¶ 1.) VW marketed and sold these securities to U.S. investors and banks ("Underwriters") without disclosing that its cars used defeat devices to conceal their substantial emissions violations or the dire financial consequences it knew it was facing as a result. To the contrary, VW repeatedly touted its supposed commitment to producing cars that reduced harmful emissions and complied with all emissions laws. (*Id.* ¶¶ 1, 9, 16.) Even when Underwriters directly asked VW if there were any investigations or environmental issues that might be material to investors, VW refused to disclose its emissions violations, the defeat device, or EPA and CARB investigations. (*Id.* ¶¶ 208(e), 208-13, 244-45, 249, 251.) As a result, VW's investors were cheated out of hundreds of millions of dollars in interest payments. (*Id.* ¶ 19.)

**Winterkorn's Strategy 2018**.  When Winterkorn became VWAG's CEO and Chairman of its Board of Management ("Board") in 2007, he publicly launched an aggressive plan to make VW the largest and most environmentally-friendly car company in the world. (*Id.* ¶¶ 5-6, 47.) To finance this ambitious goal, VW and Winterkorn needed money, and they targeted U.S. investors to get it. (*Id.* ¶¶ 9, 148.) Between 2010 and 2015, VW raised billions of dollars by selling bonds ("144A Bonds") and asset-backed securities ("ABS") to investors in the United States. (*Id.* ¶ 9.)

**VW's Defeat Device Scheme**. Winterkorn's knowledge of the defeat device fraud goes back to at least November 2007, when VW engineers told him they were using a defeat device to conceal the fact that VW's "clean diesel" engines did not comply with emissions laws. (*Id.* ¶¶ 1-2, 80-85.) The defeat device scheme began unravelling on March 31, 2014, when the International Council on Clean Transportation ("ICCT") revealed certain cars it tested discharged deadly NOx at levels nearly 40-times legal limits. (*Id.* ¶¶ 92-95.) EPA and CARB opened investigations and contacted VW with questions about the ICCT's findings. (*Id.* ¶ 105.) The ICCT's findings spread rapidly throughout all levels of VW, including to Winterkorn and other senior officials. (*Id.* ¶ 98.)

**VW's ICCT Task Force.**  In response to the ICCT's findings, VW assembled an ICCT

Task Force. The mission of the Task Force, whose members already knew about the defect device, was to come up with possible responses to the emission failures that might satisfy U.S. regulators—without revealing the defeat device. (*Id.* ¶¶ 105-07.) In April 2014, the Task Force prepared documents ("Task Force Presentation") highlighting the dire situation VW was facing, including: (a) Nearly 500,000 to 600,000 "clean diesel" vehicles in the U.S were affected; (b) VW could not bring the cars into compliance with the law; (c) U.S. authorities may test the cars to look for a defeat device; (d) VW could be hit with fines of $43,000 per car (*i.e.*, $21.5 to $25.8 billion); and (e) VW may have to recall or buy back every car. (*Id.* ¶ 109.)

The ICCT's findings and the Task Force Presentation were shared with many VW senior officials. For example, on April 15, 2014, they were emailed to Berndt Gottweis, a direct report and close confidant of Winterkorn who also knew about the defeat device. (*Id.* ¶¶ 98(d), 112.) The Task Force also met personally with Gottweis on April 28. (*Id.* ¶ 113.) The Task Force went over their findings with Gottweis, including telling him that U.S. regulators would likely find the defeat device. When the meeting ended, Gottweis said he would talk to Winterkorn.[2] (*Id.*)

Winterkorn received further updates about the emissions issues on May 19, 2014 (during a meeting of the VW Brand Board of Management at which the ICCT Study was discussed) (*Id.* ¶ 117), and again on May 23, when he received two one-page memos highlighting the depth of the problem for VW. (*Id.* ¶¶ 120-22.)

In early April 2014, attorneys in VWAG's and VWGoA's legal departments were notified about the ICCT's findings and the emissions problems affecting VW's "clean diesel" vehicles. (*Id.* ¶¶ 102-03.) One of these attorneys, VWAG ATTORNEY 1, was a member of VW's Product Safety Committee ("PSC"), along with Gottweis. The PSC was responsible for addressing issues involving product defects, including failure to "comply with statutory regulations and standards set by the authorities." Winterkorn was in charge of monitoring the work of the PSC. (*Id.* ¶ 104.)

By no later than May 15, 2014, the ICCT findings and Task Force Presentation had been

---

[2] The next day, April 29, Winterkorn and the VW Board approved VW's March 31, 2014 financials, which were included with the May 23, 2014 144A Bond Offering Memorandum. (Compl. ¶ 185.)

given to: (a) VWGoA's CEO, who also was a member of VCI's Board; and (b) VWGoA GENERAL COUNSEL, who also was a Vice President of VWGoAF and was responsible for reporting business risks to VWAG's Risk and Compliance department. These individuals were also told that EPA was investigating the emission failures. (*Id.* ¶¶ 114-15.) On or before May 19, 2014, VWGoA CEO informed VWAG BOARD MEMBER 1 about the ICCT's findings. (*Id.* ¶ 116.)

**VW Proposes a Sham Recall.** In November 2014, VW proposed to EPA recalling all "clean diesel" vehicles so it could install new software to fix the cars' high emissions. (*Id.* ¶ 127.) This was, however, only a delay tactic as VW knew the cars could not be fixed. (*Id.* ¶ 128.)

**VW's Fraud is Discovered.** Despite Winterkorn's order not to tell U.S. regulators about the defeat device, a VW employee admitted the fraud to EPA on August 19, 2015. (*Id.* ¶¶ 131-37.) The defeat device scheme was first made public on Friday, September 18, 2015, when EPA issued a Notice of Violation disclosing that VW had been using a defeat device. (*Id.* ¶¶ 134-37.) As a result, the price of VW's 144A Bonds and ABS fell in secondary market trading. (*Id.* ¶¶ 21, 153.)

**VW's 144A Bond Offerings**. In February 2014, Winterkorn and VWAG's Board directed and approved the creation of VWGoAF—a shell financing subsidiary—for the sole purpose of conducting private bond offerings in the U.S., with VWAG serving as guarantor. (*Id.* ¶¶ 39, 155, 157.) In a May 2014 memo, VWAG senior officers stressed that continued participation in the U.S. capital markets "is of utmost importance to the [VW Group] in order to assure its funding requirements and growth." (*Id.* ¶ 148.) That year (2014), VW completed two separate 144A Bond offerings—May 23, 2014 and November 20, 2014—raising $5.5 billion from U.S. investors. (*Id.* ¶ 159.) In VW's 2014 Annual Report, VWAG boasted that it was "able to exploit [a] favorable pricing situation to its advantage" through the completion of the bond offerings. (*Id.* ¶ 148.) VW sold more 144A Bonds in 2015—raising $2.5 billion—before the discovery of the defeat device fraud forced them to suspend further offerings for three years. (*Id.* ¶¶ 21, 40, 159, 180.)

Each of VW's 144A Bond offerings included several documents: (a) an Offering Memorandum; (b) a Subscription Agreement; and (c) a Due Diligence Questionnaire ("DDQ") submitted to VW by the Underwriters. (*Id.* ¶¶ 162, 164, 215.)

In each Offering Memorandum, VW emphasized—as its "top priority" and "focal point," for

1   example—its past and future commitment to producing cars that reduced exhaust emissions and

2   complied with emission laws. (*Id.* ¶¶ 175-76.) Despite the fact it was engaged in a years-long fraud

3   to evade these laws, nowhere did VW disclose any facts relating to its defeat device scheme or that

4   U.S. regulators were actively investigating its emission violations. (*Id.* ¶ 178.) Rather than tell

5   investors and Underwriters about these critical events, which threatened VW with catastrophic

6   financial and reputational damage, each Offering Memorandum contained only generic risk

7   disclosures. (*See id.* ¶ 175.) For example, VW warned only of a theoretical possibility that an

8   unknown "decline in product quality" might affect its financial position or that it may have to recall

9   vehicles. (*Id.* ¶ 175; VW Mot., Ex. A [7349-2] at 10-11.)

10          Within each Offering Memorandum, VW included its recent annual and interim financial

11   statements, which were reviewed, approved, and (for the annual statements) signed by Winterkorn.

12   (Compl. ¶¶ 181-85.) None of VW's financial statements disclosed a provision or recorded a

13   contingent liability to account for the billions of dollars in potential liability it already knew it was

14   facing because of the fraud scheme. (*Id.* ¶¶ 186-98, and 108-09.)[3]

15          VW also entered into a Subscription Agreement with the Underwriters. (*Id.* ¶¶ 164, 215.)

16   VW falsely represented in this agreement that there were no pending or threatened "investigations

17   or other out-of-court proceedings" that could materially affect its business or financial results. It

18   also falsely assured the Underwriters that it was complying with applicable "environmental, health,

19   and safety laws" affecting its business. (*Id.* ¶¶ 215, 219-22.)

20          Lastly, the Underwriters required VW to answer multiple DDQs. If answered truthfully,

21   VW's responses would have revealed the emission violations and government investigations,

22

---

23   [3] Citing several public releases announcing past DOJ/EPA settlements with car companies, VW
     contends that "no one could have predicted" the amount of money that VW would end up paying to
24   settle the many claims against it. (VW Mot. at 16-17.) But VW's own Task Force highlighted in
     April 2014 that penalties of $43,000 per car (at least $21 billion) could be imposed for its years-
25   long fraud, which is why VW tried so hard to hide it. Moreover, VW does not (and cannot, in the
     context of a motion to dismiss) compare whatever the underlying facts were in those cases with the
26   egregiousness of its fraud here. Nor does it say whether any of those companies paid more money
     on top of the DOJ/EPA settlements to resolve the issues—as VW did here. At best, VW's apples-to-
27   oranges comparison presents factual questions for a jury, not legal arguments that can be resolved
     on a motion to dismiss. (VW doesn't argue that it can be.)
28

among other things. (*Id.* ¶¶ 208-14.) VW, however, did not disclose any of that information. (*Id.* ¶¶ 209-14.) For example, the Underwriters directly asked VW to confirm that the "risk factors" in the Offering Memorandum "accurately reflect [VW's] views and current situation." Specifically, the DDQs asked VW "confirm" that:

> "all statements, ***including the risk factors in the offering memorandum for the bond offering***, … are correct and accurately reflect [VW's] views and current situation and … do[] not omit any information which might reasonably be considered to be relevant to an investor in the bond offering so as to enable such investor to fully assess the risks inherent in an investment in this offering."

(*Id.* ¶ 208(f) (emph. added).) In response, VW falsely confirmed that the risk factor statements were accurate and complete, accurately reflected its views and current situation, and did not omit any information an investor might consider relevant in assessing the risks of an investment in the bonds. (*Id.* ¶ 210(f).)[4]

**VW's ABS.** In addition to the 144A Bond offerings, VCI sponsored four separate ABS offerings. These included three different categories of ABS:

- Volkswagen Auto Lease Trust ("VALT") offerings based on collateral pools of consumer automobile leases;

- Volkswagen Auto Loan Enhanced Trust ("VALET") offerings based on collateral pools of consumer automobile loans; and

- Volkswagen Auto Master Owner Trust ("VWMT") offerings based on collateral pools of inventory financing loans to VW and Audi dealerships.

(*Id.* ¶¶ 227-231.) The VALT (dated, February 19, 2015) and two VALET (dated, April 16, 2014 and October 9, 2014) offerings were public offerings of securities that were required to comply with Regulation AB of the federal securities laws. (*Id.* ¶¶ 229-31.) The VWMT offering (dated, August 12, 2014) was a private offering of ABS pursuant to Rule 144A. (*Id.*) A significant portion of the

---

[4] Just prior to each offering, the Underwriters served a second set of DDQs asking VW to confirm there had been no legal, regulatory, or other material developments since VW's responses to the prior DDQs, and that the statements in the Offering Memorandum were still correct and complete and did not omit any information an investor may consider relevant. Once again, VW omitted all information about the emissions violations or ongoing regulatory investigations. (*Id.* ¶¶ 211-13.)

collateral supporting the ABS in these offerings was comprised of financing and lease agreements for VW cars containing the illegal defeat device. (*Id.* ¶ 232.)

**The False and Misleading ABS Offering Documents.**  VCI prepared a Prospectus for each VALT and VALET offering, and an Offering Memorandum for the VWMT offering. For the VALT and VALET offerings, Regulation AB imposed a duty on VCI to make a number of specific disclosures in the Prospectuses, including:

- Identifying "the most significant factors that make the offering speculative or risky. *See* [Reg. AB] § 1103(b) (incorp. 17 C.F.R. § 229.503(c)";

- Disclosing "information or factors related to the sponsor that may be material to an analysis of the origination or performance of the pool assets. [Reg. AB] § 1104(c);

- Identifying and discussing the material characteristics of the asset pool, including the "legal or regulatory provisions … [that] may materially affect pool asset performance or payments or expected payments on the [ABS]… [Reg. AB] § 1111."

(*Id.* ¶ 234.) VCI, however, did not disclose any information about the defeat device fraud, the government investigations, or the fact that a significant portion of the ABS asset pools were tied to cars using an illegal defeat device. (*Id.* ¶ 236.) What's more, VCI affirmatively represented in the Prospectuses that the disclosures required by Section 1111 of Regulation AB "were accurate in all material respects." (*Id.* ¶¶ 235-39.)

The VWMT Offering Memorandum, in which VCI claimed to identify the "principal material risks of investing in [that ABS]," similarly omitted all information related to the defeat device or ongoing government investigations into VW's emission violations. (*Id.* ¶ 240.)

Similar to the 144A Bond offerings, Underwriters for the ABS offerings required that VCI answer DDQs. (*Id.* ¶ 244.) And also like the 144A Bond offerings, VCI falsely answered the DDQs. (*Id.* ¶¶ 245-51.) For example, VCI falsely told the Underwriters:

- There were no material changes expected in the performance of the collateral pool that are likely to be materially adverse to investors.

- There was no reason to believe the current ABS asset pools would perform differently than the delinquency and credit loss statistics for past asset pools that VCI disclosed in the offering documents.

1   (*Id.* ¶¶ 244-46.) Moreover, in response to questions asking whether there were any "recent

2   regulatory investigations" or "any material pending or threatened federal or state regulatory

3   developments or actions that are likely to have a material adverse effect on VCI or its affiliates,"

4   VCI disclosed only a "Bear hunting review" and other minor state inquiries. (*Id.* ¶¶ 249, 251.)

5       VCI employees conducted no investigation and made no inquiries before making these false

6   representations, and VCI had no policies in place requiring them to do so. (*Id.* ¶¶ 252-54.)

### RULE 12(B)(6) LEGAL STANDARD

7       The legal standard generally applicable to a Rule 12(b)(6) motion to dismiss was set out by

8   the Court in *In Re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*, 2017

9   WL 3058563 (N.D. Cal. July 19, 2017):

> In considering a motion to dismiss a securities fraud action, courts must, as with any motion
> to dismiss for failure to plead a claim on which relief can be granted, accept all factual
> allegations in the complaint as true. Presuming all factual allegations to be true, the Court
> must then determine if the complaint pleads enough facts to state a claim to relief that is
> plausible on its face.  A claim is plausible when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the defendant is liable for the
> misconduct alleged. Courts must consider the complaint in its entirety, as well as other
> sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in
> particular, documents incorporated into the complaint by reference, and matters of which a
> court may take judicial notice. If the Court grants a motion to dismiss, it will give leave to
> amend when justice so requires.

*Id.*, 2017 WL 3058563, at *3 (quotes and cites omitted); *see also SEC v. Sablok*, 2009 WL

10690310, at *2 (N.D. Cal. Feb. 18, 2009) (court "must…draw all reasonable inferences in favor of

[the plaintiff]"). And while the SEC's fraud claims are subject to FRCP 9(b), the heightened

pleading requirements of the Private Litigation Securities Reform Act ("PSLRA") do not apply to

SEC enforcement actions. *Gebhart v. SEC*, 595 F.3d 1034, 1041 n.9 (9th Cir. 2010); *SEC v. Sells*,

2012 WL 3242551, at *8 (N.D. Cal. Aug. 10, 2012). Nor is the SEC required to prove "transaction

and loss causation," "injury," or "reliance." *Gebhart*, 595 F.3d at 1041 n. 8; *SEC v. Hilsenrath*,

2008 WL 2225709, at *5 (N.D. Cal. May 29, 2008). These judicially-created, extra-textual elements

do not "bear on the determination of whether the securities laws were violated," and bear "only on

whether that private plaintiff may recover damages." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d

1233, 1244 (11th Cir. 2012); *SEC v. Rana Research*, 8 F.3d 1358, 1363 (9th Cir. 1993).

# ARGUMENT

## I.    DOJ Did Not Release The SEC's Claims.

There are two reasons why the SEC's claims against VCI cannot be dismissed based on the FIRREA Settlement VW entered into with DOJ. First, DOJ does not have the authority to unilaterally release civil securities law claims. Second, the scope of the release, which makes no mention of the SEC or the federal securities laws, does not cover the SEC's claims.

### A.   DOJ Could Not Unilaterally Release the SEC's Civil Claims Against VCI.

The SEC is an independent agency of the federal government to which Congress has given "complete autonomy" over the civil securities laws claims asserted in this case. *SEC v. Robert Collier & Co.*, 76 F.2d 939, 940 (2d Cir. 1935) (Hand, L.). VW's release argument is premised on general language in the FIRREA Settlement releasing VW from civil claims that "the Civil Division of the Department of Justice has *actual and present authority* to assert and compromise pursuant to 28 C.F.R. § 0.45." (VW Mot., Ex. B ¶ 5 (FIRREA Settlement; emph. added).) In other words, if DOJ Civil could not unilaterally bring and compromise civil Securities Act claims at issue without the SEC's approval, VW's release argument fails.

In 28 U.S.C. § 516, Congress generally authorized "the Department of Justice, under the direction of the Attorney General," to conduct litigation on behalf of the United States or its agencies. That same statute, however, also recognizes that DOJ's authority can be limited. It states:

> "*Except as otherwise authorized by law*, the conduct of litigation in which the United States, an agency, or officer thereof is a party … is reserved to officers of the Department of Justice, under the direction of the Attorney General." (Emph. added.)

The highlighted language makes clear that DOJ's general authority to pursue claims may be restricted where Congress has "otherwise authorized" an agency to act for itself.

Many courts have recognized Congress' right to authorize agencies to institute and settle their own litigation independent of the Attorney General. *See United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (recognizing Congress' right to limit Attorney General's authority to litigate and settle claims); *Comptroller of Currency v. Lance*, 632 F. Supp. 437, 440 (N.D. Ga. 1986) (holding that Section 12(i) of the Securities Exchange Act, which provides that the

Comptroller of Currency may "administer and enforce" certain provisions in the Exchange Act, "is precisely the type of authorization that provides the foundation for an exception from the requirements of 28 U.S.C. § 516"); *FDIC v. Irwin*, 727 F. Supp. 1073, 1075-76 (N.D. Tex. 1989) (statute authorizing FDIC to "sue or be sued" gave the FDIC "independent authority to settle" its claims). Here, in accordance with 28 U.S.C. § 516, Congress gave the SEC authority to bring the civil securities fraud claims alleged in the complaint.

When Congress created the SEC in 1934, it expressly gave it authority to enforce *civil* securities fraud claims arising under both the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act, leaving DOJ with authority over *criminal* enforcement of those Acts. Congress' delegation of civil enforcement authority to the SEC is found in Section 21(d)(1) of the Exchange Act and Section 20(b) of the Securities Act. Section 20(b) of the Securities Act provides:

> "Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this this subchapter, or of any rule or regulation prescribed under authority thereof, ***the Commission may, in its discretion, bring an action*** in any district court of the United States … to enjoin such acts or practices … ."
>
>       \*   \*   \*
>
> The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, *who may*, in his discretion, ***institute the necessary criminal proceedings*** under this subchapter."[5] (Emph. added.)

Congress adopted this specific language with the "inten[t] to give the Commission complete autonomy in civil prosecutions." *Collier*, 76 F.2d at 940; *Paradyne*, 1985 WL 5839, at \*1 (Congress authorized the SEC "to litigate its own civil cases"). Shortly after Congress created the SEC in 1934, Judge Learned Hand and his colleagues were faced with the question of whether the SEC was given independent authority to pursue civil securities fraud claims under the Securities Act or whether "control over civil, as well as criminal, prosecutions" was left in the hands of the Attorney General. *Id*. at 939-40. Reversing the district court, the Second Circuit held that Congress gave the SEC "complete autonomy" to pursue civil securities fraud claims. *Id*.

In support of this ruling, Judge Hand reviewed the legislative history behind the adoption of

---

[5] Section 21(d)(1) of the Exchange Act contains nearly identical language.

the language quoted above. As initially proposed in Congress, the language of the bill gave the Commission only authority to *investigate* securities fraud. The Attorney General retained the power to bring both civil and criminal securities fraud claims. *Id*. However, based on the recommendation of the chief counsel to the FTC, Congress amended the language to give the Commission authority to *investigate and prosecute* civil actions, with discretion to send evidence to the Attorney General for criminal prosecutions. *Id*. at 940.[6]

None of the cases VW cites hold that DOJ has "actual authority" to independently release the civil Securities Act claims at issue here. In *Margalli-Olvera v. INS*, the Eighth Circuit held that the U.S. Attorney had actual authority to bind the Immigration and Naturalization Service ("INS") to a plea agreement. The court noted that the U.S. Attorney's office and INS were "two offices within the Department of Justice" and that the plea agreement "on its face purports to bind the INS." 43 F.3d 345, 352, 353 (8th Cir. 1994). In *United States v. Harvey*, 791 F.2d 294 (4th Cir. 1984), the court found that a plea agreement entered into by the U.S. Attorney for Northern District of Virginia precluded defendant's prosecution for similar crimes by the U.S. Attorney in South Carolina. *Id*., 791 F.2d at 303. Here, unlike the situations in those cases, the SEC is an independent agency and not an office within the Department of Justice, and the FIRREA Settlement does not mention the SEC. *See*, *e.g.*, *SEC v. Fed. Labor Rel. Auth.*, 568 F.3d 990, 997-98 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting differences between an "independent agency" like the SEC and a "traditional Executive Branch agency" like the Department of Justice); *cf. United States v. Rourke*, 74 F.3d 802, 808, 810 (7th Cir. 1996) (holding U.S. Attorney's office had no authority to bind Federal Aviation Administration to plea agreement).[7]

---

[6] Congress created the SEC in 1934. Before then, the administration of the Securities Act was entrusted to the FTC. *Collier*, 76 F.2d at 939; *Jones v. SEC*, 298 U.S. 1, 3 (1936). Congress transferred civil enforcement authority of the Securities Act to the SEC in 1934. *Jones*, 298 U.S. at 3; 17 C.F.R. §200.1 (noting that administration of the Securities Act was transferred to SEC). Thus, VW's argument that Congress could not have given the SEC authority over civil enforcement of the Securities Act, because it did not exist when the Securities Act was passed in 1933, is meritless.

[7] VW also cites a Nevada district court decision ruling on a *pro hac vice* motion, *SEC v. Banc De Binary Ltd.*, 2014 WL 2197740 (D. Nev. May 27, 2014). There, the Judge ultimately allowed the non-resident SEC attorneys to appear despite believing the local U.S. attorney's office could

VCI's motion to dismiss should be denied because DOJ could not unilaterally release the SEC's civil securities law claims.

**B.   The Language of the FIRREA Settlement Does Not Release the SEC's Claims.**

The second reason VW's motion should be denied is because the language of the FIRREA Settlement does not "unambiguously release" the SEC's claims. *See Asarco,* 765 F.3d at 1010 (reversing dismissal where questions as to proper interpretation of settlement agreement, which did not "unambiguously release" plaintiff's claims, could not be decided at pleading stage).

The FIRREA Settlement is between DOJ and VW. The SEC, an independent federal agency, is not a party to it. In fact, it makes no reference ***at all*** to the SEC, the Securities Act, the Exchange Act, or even generally to "federal securities laws." To the contrary, the language the parties used actually suggests they knew the SEC's securities law claims were not being released. In Paragraph G, the agreement provides that "the United States contends it has certain civil claims, as specified in Paragraph 5 below, against VW" arising out of certain defined "Covered Conduct." (VW Mot., Ex. B ¶ G.) Paragraph 5, in turn, describes the claims being released and specifically identifies several federal statutes. But it does not include even a generic reference to the Securities Act or the Exchange Act. (*Id.*) Nothing in Paragraph 5 or anywhere else in the agreement suggests DOJ (or VW) thought that the "certain civil claims" DOJ was releasing included civil securities law claims.

As noted above, VW's release argument is based entirely on the last clause in Paragraph 5 referencing 28 C.F.R. § 0.45. That regulation, however, is not an independent grant of authority to DOJ Civil to bring claims arising under the federal securities laws. It is simply an administrative regulation allocating responsibility for handling certain types of civil cases already within DOJ's purview to the Civil Division. *See* 28 C.F.R. § 0.45 ("**General functions.** The following-described matters are assigned to, and shall be conducted, handled, or supervised by, the Assistant Attorney

---

prosecute the SEC's claims. *Id.*, at *1. The court's decision, which did not discuss *Collier,* may have been influenced in part by his broader "policy of denying out-of-state government attorneys *pro hac vice* admission" in his court, a policy the Ninth Circuit later rejected as "clear error." *See In re United States District Court*, 791 F.3d 945, 950 (9th Cir. 2015) (mandamus proceeding brought in different case by U.S. Attorney's office). In any event, the court did not hold that DOJ can unilaterally release the SEC's claims.

1    General, Civil Division: …"). In fact, like the FIRREA Settlement, it contains no reference

2    whatsoever to the Securities Act, the Exchange Act, or the SEC.[8] And it makes complete sense that

3    neither the FIRREA Settlement nor this federal regulation mention these securities laws or the SEC.

4    Because, as discussed above, Congress had already given the SEC "complete autonomy" to pursue

5    civil claims under the Securities Act and Exchange Act. *Collier*, 76 F.2d at 940.[9]

6          In Fiscal Year 2019, the SEC's Division of Enforcement brought more than 800 civil actions

7    and administrative proceedings involving violations of the federal securities laws and distributed

8    approximately $1.2 billion to harmed investors.[10] To our knowledge, DOJ has never filed a civil

9    action alleging violations of the Exchange Act or the Securities Act. Nevertheless, VW asks this

10   Court to conclude that DOJ waived these claims and any potential distribution to harmed investors

11   without even acknowledging that it was doing so in the text of the relevant document.

12         Even the description of relevant conduct in the FIRREA Settlement is consistent with the

13   notion that neither party thought the agreement included claims for violating the Exchange Act or

14   the Securities Act. Paragraph 5 of the FIRREA Settlement limits the release to "claims against the

15   VW Released Entities for the Covered Conduct …" (VW Mot., Ex. B ¶ 5 and ¶ 6(d) (noting that

16   claims "for any conduct other than Covered Conduct" are not released).) The term "Covered

17   Conduct" is defined to include "certain ABS" issued by VCI where "[f]ederally insured financial

18   institutions served as trustees for [these ABS] and also purchased certain notes in these ABS." (*Id*. ¶

19   G.) What the term "Covered Conduct" does not include, however, are ABS purchases by

20

21   _____

22   [8] Notably, these statutory provisions are addressed in Title 17 of the C.F.R. For example, 17 C.F.R.
     § 202.5(b) states that "the Commission may *in its discretion* take one or more of the following

23   actions: … initiation of injunctive proceedings in the courts… ." (Emph. added.) But nowhere do
     the regulations state DOJ can release civil securities claims without any involvement by the SEC.

24   [9] That VW was able to locate a handful of DOJ settlements where the parties expressly noted that

25   the SEC's claims were *not* being released is irrelevant. Those other agreements are nothing more
     than examples of drafting clarity. They certainly are not proof, as a matter of law, that DOJ

26   unambiguously released or even intended to release the SEC's claims in the FIRREA Settlement at
     issue here. If that *was* the intent of the parties—to release civil claims under the federal securities

27   laws—they could have just as easily (and should have) stated so in Paragraph 5.

28   [10] Division of Enforcement 2019 Annual Report at 14-17. https://www.sec.gov/files/enforcement-
     annual-report-2019.pdf

investors—as opposed to the banks' purchases. Here, the complaint alleges that the ABS were purchased by investors in addition to the banks (*i.e.*, Underwriters). (Compl. ¶¶ 233, 241-243.) Thus, the scope of this particular release would not bar the SEC's claims against VCI for misleading ABS *investors*. If VW truly intended to negotiate a release of all securities claims, the FIRREA Settlement's description of covered conduct would not be limited to the type of transactions that form the jurisdictional hook for a FIRREA violation.

Because the language of the FIRREA Settlement does not demonstrate, as a matter of law, that DOJ "unambiguously released" the SEC's civil Securities Act claims, VCI's motion should be denied for this reason as well.

## II.    The SEC's Complaint Properly Alleges VCI Violated <u>Sections 17(a)(2) and (a)(3) of the Securities Act.</u>

"Section 17(a)(2) and (a)(3) of the Securities Act make it unlawful for a party, directly or indirectly and in the offer or sale of securities, [§ 17(a)(2)] 'to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact,' or [§ 17(a)(3)] 'to engage in any practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.'" *Cole*, 2015 WL 5737275, at *6 (*quoting* 15 U.S.C § 17(a)); *SEC v. Wayland*, 2019 WL 2620669, at *5 (C.D. Cal. Apr. 8, 2019). Unlike Section 17(a)(1), which requires scienter, violations of these provisions are satisfied with proof of "at least negligence." *Wayland*, 2019 WL 2620669, at *5.

### A.    VCI Made False and Misleading Statements and Omissions to Underwriters and Investors.

The SEC's complaint alleges VCI made false statements and misleading omissions in their responses to Underwriters' DDQs <u>and</u> in the ABS offering documents. Because VW's opening brief does not challenge the complaint's allegations that its DDQ responses were false and misleading, that argument is waived. *Erler v. Erler*, 2018 WL 3421911, at *1 (N.D. Cal. July 16, 2018); *United States v. Rodriguez*, 2007 WL 2778917, at *3 (N.D. Cal. Sept. 21, 2007).

#### 1.    VCI Made False and Misleading Statements in the Offering Documents.

Regulation AB requires that certain information be disclosed in the prospectus. The complaint identifies specific categories of information Regulation AB required VCI to

1  disclose in its VALT and VALET Prospectuses, including:

2    • "'the most significant factors that make the offering speculative or risky.' *See* [Reg.
        AB] § 1103(b) (incorp. 17 C.F.R. § 229.503(c))";

3

4    • "'information or factors related to the sponsor that may be material to an analysis of
        the …. performance of the pool assets … .' [Reg. AB] § 1104(c)"; and

5

6    • "A description of the material characteristics of the pool including: 'If legal or
        regulatory provisions … may materially affect pool asset performance or payments

7      or expected payments on the [ABS], briefly identify these provisions and their
        effects on such items.' [Reg. AB] § 1111."

8  (Compl. ¶ 234.) Contrary to VCI's assertion, the SEC is not alleging it had to check under

9  the hood of every car looking for defects. What the complaint *does* allege, however, is that

10 Regulation AB imposed a duty on VCI to disclose the "most significant" risks for the

11 offerings, as well as information that could be material to the "performance of the [ABS]

12 asset pool." (*Id.* ¶ 234.) VW's emissions violations, which affected a significant portion of

13 the cars whose financing agreements made up the ABS asset pools for the VALT and

14 VALET offerings, fit squarely into these categories. (*Id.* ¶¶ 232, 236.) VCI's omission of

15 this information is actionable. *See Silverstrand Investments v. AMAG Pharms., Inc.,* 707

16 F.3d 95, 102 (1st Cir. 2013) (omission was actionable because disclosure of "most

17 significant risk factors" was required by SEC regulation S-K); *In re Countrywide Fin. Corp.*

18 *Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008) (citing Regulation AB and noting

19 that "failing to disclose the evaporation of the most fundamental assumption that makes

20 historical performance data useful—that the current loans materially resemble the previous

21 loans—could be independently false or misleading"). Moreover, the missing information—

22 *e.g.*, the scope of the emissions violations and their serious consequences (including car

23 recalls and buybacks)—was known to senior officials and lawyers within VW, including

24 within VCI itself. (Compl. ¶¶ 114, 124.)

25      VCI argues that its failure to disclose this information is not actionable because "VCI

26 had 'no duty to disclose uncharged, unadjudicated wrongdoing." (VW Mot. at 25.)

27 Similarly, VCI argues it had no general duty to list every possible law or regulation that may

28

affect the ABS. (*Id.* at 25-26.) The problem with these arguments—and every court decision cited to support them—is that they ignore the independent disclosure duties imposed by Regulation AB.

And while VCI's omission of information required by Regulation AB is independently actionable, it also rendered misleading the Prospectuses' discussion of historical asset pool performance data for prior offerings. As alleged in the complaint, the presentation of historical pool performance information (*e.g.*, the historical loss and delinquency data) is provided so potential investors can use it to evaluate the existing ABS investment. (Compl. ¶ 238.) That historical data, however, is not useful for analyzing and predicting the performance of the existing asset pool where the ABS issuer is aware of new, undisclosed information that could materially affect the performance of the current asset pool or otherwise increase the riskiness of the investment. That is why Regulation AB required VCI to disclose it. *See Countrywide*, 588 F. Supp. 2d at 1160.

For the same reason, VCI's argument that it had no duty to disclose the "emissions laws" and "regulations" applicable to its vehicles is meritless. Section 1111 of Regulation AB required that VCI identify and describe the effect of the "legal or regulatory provisions" that "may materially affect pool asset performance or payments or expected payments on the [ABS]." (Compl. ¶ 234(c).) VW's own internal analysis, which was shared with a VCI Board member, warned that 500,000 to 600,000 "clean diesel" cars were violating emissions laws and that VW might have to recall or buy back every one of them as a result. (*Id.* ¶¶ 108-113, 120-122.) This was exactly the type of information that "may materially affect pool asset performance or payments or expected payments on the notes." VCI violated Section 1111 by failing to disclose it. (*Id.* ¶ 237.)[11]

---

[11] VCI did not simply omit the disclosures required by Section 1111. It affirmatively and falsely represented that the disclosures required by Section 1111 "were accurate in all material respects," including the Prospectuses' description "of the legal and regulatory provisions that may materially and adversely affect the performance of the receivables or payments on the notes." (*Id.* ¶ 234(d).)

### 2.   VCI Failed to Disclose the "Principal Material Risks" of the Private ABS.

Regulation AB did not apply to VCI's private ABS offering (VWMT). (*Id.* ¶¶ 229, 231.) However, VCI's affirmative representation in the Offering Memorandum that it had disclosed the "principal material risks" of this offering was false and misleading. (*Id.* ¶ 240.) VCI knew about the "clean diesel" emissions violations, the existing federal and state investigations, and the devastating consequences VW was facing as a result. (*Id.* ¶¶ 99(g), (p) and (q), 114, 124.) These "principal material risks" needed to be disclosed. (*Id.* ¶ 240.)

VCI argues that it is unreasonable to expect it to disclose every possible risk and that the SEC supposedly has not identified a "statement" that was rendered misleading because of its omissions. Both arguments miss the mark. The SEC alleges: (a) VCI affirmatively represented in the VWMT Offering Memorandum that it was identifying the "principal material risks of investing in [the VWMT offering]" and (b) "[t]hat this statement was false and misleading." (*Id.* ¶ 240.) It is false and misleading not because VCI needed to disclose every possible risk, but because it said it disclosed the "principal material risks," but omitted the most significant risk to an investment in the ABS—*i.e.*, the defeat device scheme. (*Id.*)

### B.   VCI Acted *At Least* Negligently

The SEC need only prove that VCI acted negligently to establish its liability under Section 17(a)(2) and (a)(3). *Dain Rauscher*, 254 F.3d at 856 ("Violations of Sections 17(a)(2) and (3) require a showing of negligence."). "To establish negligence, Plaintiff must show Defendant[] failed to exercise reasonable care in obtaining or communicating the information." *SEC v. Blockvest, LLC*, 2018 WL 4955837, at *6 (S.D. Cal. Oct. 5, 2018). "[N]egligence may consist either of *doing* something that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something that a reasonably careful person *would do* under like circumstances." *Cole*, 2015 WL 5737275, at *6 (quote and cite omitted) (emph. in orig.); *cf. In re Anthony Fields*, Rel. No. 33-9727, 2015 WL 728005, at *10 (Comm'n Op. Feb. 20, 2015) (because ordinary meanings of the terms "practice" and "course of business" "denote[] routine, customary, or repeated conduct," there is liability for repeated misstatements over a period of time). Here, the SEC's complaint alleges VCI acted

negligently and/or recklessly in making the false representations and omissions in its offering documents and DDQ responses because *it did nothing* to investigate the accuracy of the information it was providing to investors and Underwriters and, contrary to industry custom and practice, had no policies in place requiring its employees to conduct an investigation to ensure the information was accurate. (*Compl.* ¶¶ 252-54, 271.)[12]

VCI presents three arguments why the SEC's allegations of negligence are supposedly insufficient. All are wrong. First, the SEC did not plead itself out of court by alleging certain VCI directors/employees *knew* about the EPA and CARB investigations and the dire financial consequences VW was facing. (VW Mot. at 28.) VCI seems to be arguing that the SEC's claims fail because the complaint suggests VCI made the false and misleading statements knowingly. But even if true, the Section 17(a)(2) and (a)(3) claims cannot be dismissed. The SEC is required to plead "at least negligence"—not only negligence. *Wayland*, 2019 WL 2620669, at *5. Knowing or reckless conduct also violates these provisions. *SEC v. Guardian Oil & Gas, Inc.*, 2014 WL 7330451, at *7 (N.D. Tex. Dec. 23, 2014) (same allegations showing defendant acted with scienter can also show defendant acted negligently in violation of Section 17(a)(2) and (a)(3)); *Duncan*, 2009 WL 10670521, at *11 ("because defendants acted at least recklessly, their conduct is more than sufficient to satisfy the negligence standard required to violate Section 17(a)(2) and (3)").

Second, VCI attacks the SEC's negligence claim on the false premise that the complaint alleges VCI lacked only a "written" policy requiring it to conduct an investigation. Not true. The complaint alleges VCI had "***no policies or procedures***"— contrary to industry practice. (Compl. ¶¶ 253-255 (emph. added).) The fact that VCI had "no policies or procedures"—not simply "written" ones—is just one reason why VCI acted at least negligently. *See Dain Rauscher*, 254 F.3d at 857 (whether a defendant failed to comply

---

[12] VCI claims it had "robust due diligence process" in place. (VW Mot. at 28 n.20.) This apparently will be a disputed issue of material fact. (*See* Compl. ¶¶ 252-55.) But, as VCI recognizes, it is a dispute that cannot be resolved on a motion to dismiss.

1   with industry custom or practice is a relevant but non-dispositive factor in determining

2   whether defendant acted negligently).[13]

3        Finally, citing inapplicable private securities cases, VCI inaccurately argues the SEC

4   must allege causation or a "transactional nexus" between VCI's misconduct and its false and

5   misleading statements and omissions. (VW Mot. at 29.) But "transaction and loss causation"

6   are "inapplicable" to SEC enforcement actions. *Gebhart*, 595 F.3d at 1041 n. 8 (holding

7   SEC does not need to prove "transaction and loss causation" or "economic injury"). Rather,

8   to prevail under Section 17(a), the SEC must show that defendants' misconduct occurred "in

9   the offer or sale" of securities.  This "broad[]" phrase is "expansive enough to encompass

10  the entire selling process," *United States v. Naftalin*, 441 U.S. 768, 773 (1979), and covers

11  VCI's conduct alleged in the complaint.

12       In any event, the complaint does allege a connection between VCI's misconduct and

13  its false and misleading statements and omissions. VCI provided Underwriters and investors

14  with false and misleading information because it did nothing to determine the accuracy and

15  completeness of the information. (Compl. ¶¶ 252-55.) VCI knew exactly the information the

16  Underwriters believed was important because they asked for it in their DDQs. (*Id.* ¶ 244.)

17  The complaint further alleges that investors and Underwriters relied on the accuracy and

18  completeness of the information VCI was putting out, which VCI knew. (*Id.* ¶ 243.)

19  Drawing all reasonable inferences in the SEC's favor, the complaint alleges VCI's

20  misconduct resulted in it providing Underwriters and investors with false information.

### C.  The Complaint Adequately Alleges VCI Engaged in Misconduct "Which Operates as a Fraud or Deceit Upon Purchasers" of its ABS.

22       Section 17(a)(3) of the Securities Act makes it lawful to "to engage in any

23  transaction, practice, or course of business which operates or would operate as a fraud or

24  deceit upon the purchaser" of a security. This is "expansive language" that prohibits a "wide

25  range of conduct." *See Lorenzo*, 139 S. Ct. at 1101-02 (interpreting similar language found

26

27

28  _____

[13] The complaint also alleges VCI was negligent and/or reckless because it in fact conducted no investigation into the accuracy and completeness of the information it provided. (Compl. ¶ 252.)

1  in Exchange Act Rule 10b-5(c)); *Malouf*, 933 F.3d at 1260 (applying *Lorenzo* to Section

2  17(a)(3) because language is "virtually identical" to Rule 10b-5(b).) That includes the

3  dissemination of false statements to investors even where deceptive "conduct other than

4  misstatements" is absent. *Lorenzo*, 139 S. Ct. at 1101 (rejecting argument that language of

5  this provision only applies where "conduct other than misstatements is involved"); *Malouf*,

6  933 F.3d at 1260 (defendant's failure to correct misstatements disseminated to investors was

7  a "transaction, practice, or course of business which operates or would operate as a fraud or

8  deceit" in violation of Section 17(a)(3)).

9       Moreover, the language of Section 17(a)(3) "'focuses upon the <u>effect</u> of particular

10 conduct on members of the investing public, rather than on the culpability of the person

11 responsible.'" *Pocklington*, 2018 WL 6843665, at *8 (*quoting Aaron v. SEC*, 446 U.S. 680,

12 697 (1980) (emph. in orig.). And because it includes "negligent violations," there is no need

13 to show that defendant's "principal <u>purpose</u>" was "creating a false appearance of fact." *Id.*,

14 at *9 (emph. in orig.) (quote omitted). "Instead, for negligent violations of Section 17(a)(3),

15 the Court will analyze whether a defendant's negligent conduct has the effect of creating a

16 false appearance of fact." *Id.*

17      Here, the complaint alleges VCI acted at least negligently in violation of Section

18 17(a)(3) by repeatedly disseminating false and misleading statements without taking any

19 steps to determine whether those statements were accurate and complete. *Dain Rauscher*,

20 254 F.3d at 858-59 (fact questions existed over whether defendant acted negligently or

21 recklessly where he did not investigate whether statements made in offering materials were

22 accurate); *Pocklington*, 2018 WL 6843665, at *9 ("Walton's negligent conduct had the

23 effect of furthering the misrepresentations and omissions in the PPMs which created a false

24 appearance of fact regarding the use of investor funds and Pocklington's involvement.").

25 Because of VCI's negligent and/or reckless conduct, ABS investors and Underwriters were

26 told to believe a state of affairs existed when in fact it did not.[14]

27

28 ─────────────────────

[14] *E.g.*, No EPA or CARB investigations (Compl. ¶¶ 236, 240, 245, 249, 251), no other

Although VCI recognizes that "[d]issemination of a false or misleading statement" may violate Section 17(a)(3), it argues that the act of dissemination must be "itself deceptive" and that the SEC supposedly does not allege VCI engaged in any deceptive conduct. (VW Mot. at 30 (*citing SEC v. Mapp*, 240 F. Supp. 3d 569, 586 (E.D. Tex. 2017).).) This is not an accurate statement of the law or the complaint's allegations. Section 17(a)(3) prohibits "any transaction [or] practice" so long as it "operates or would operate as a fraud or deceit upon the purchaser." It is "'the <u>effect</u> of particular conduct on members of the investing public'" that counts. *Pocklington*, 2018 WL 6843665, at *8 (*quoting Aaron*, 446 U.S. at 697 (emph. in orig.). The dissemination of information which "creat[es] a false appearance of fact" is enough. *Id.*, at *9; *Dain Rauscher*, 254 F.3d at 858-59. Here, the complaint alleges VCI misled investors and Underwriters by making false and misleading statements in the ABS offering documents and DDQ responses. That is more than sufficient.[15]

In a passing remark (VW Mot. at 30 n.22), VCI suggests that Section 17(a)(3) requires proof of deceptive conduct that goes beyond the dissemination of false or misleading statements. That argument was squarely rejected by the Supreme Court in *Lorenzo*. 139 S. Ct. at 1100-01 (rejecting argument that nearly identical language in Rule 10b-5(c) is limited to situations where "conduct other than misstatements is involved"); *Malouf*, 933 F.3d at 1260 (applying *Lorenzo* to Section 17(a)(3)); *SEC v. Kameli*, 2020 WL 2542154, at *14 (N.D. Ill. May 19, 2020) ("*Lorenzo* effectively abrogated the line of cases … holding that claims under Rule 10b-5(a) and (c) cannot be based on the same

---

developments that might materially impact asset pool performance (*id*. ¶¶ 236-37, 239, 246-48), no violations of laws or regulations by VCI or its affiliates (*id*. ¶ 245).

[15] The *Mapp* case cited by VW is inapplicable. There, the Texas district court dismissed the Section 17(a)(3) claim because the defendant had no duty to disclose his compensation. 240 F. Supp. 3d at 586 ("[A]bsent a duty to disclose" his compensation, defendant's failure to disclose it was not actionable under Section 17(a) or Section 10(b).) By contrast, this case is not a pure omission case for which there is no independent duty of disclosure. The SEC's complaint alleges VCI affirmatively made false statements, as well as actionable omissions. The omissions are actionable both because Regulation AB imposed an independent duty to disclose the facts and because the omission of material facts rendered misleading other statements made by VCI.

conduct as claims under Rule 10b-5(b).”). Thus, VW’s pre-*Lorenzo* decisions are inapposite.

The complaint adequately alleges VCI violated Section 17(a)(3)’s prohibition against conduct “which operates or would operate as a fraud or deceit upon the purchaser.”

### III.    VW’s Misleading Risk Disclosures in Bond Offering Memos Are Actionable.

VW argues that two of the misleading risk disclosures in its 144A Bond Offering Memoranda are not actionable because they supposedly are “indisputably accurate.” But that is not the law. *See Bondholders*, 2017 WL 3058563, at *6-7 (N.D. Cal. July 19, 2017) (although “not necessarily false,” the OM’s “R & D statements and ‘risk factors’ were generally misleading without disclosure of the massive defeat-device scheme”). Similar to other misleading statements, a company’s risk disclosures are actionably misleading where they leave the reader with the false impression that the stated risks are mere future possibilities despite the fact those risks have already begun to materialize. *SEC v. Ustian*, 2019 WL 7486835, at *32-33 (N.D. Ill. Dec. 13, 2019) (question of fact existed as to whether risk factor warning of possibility that EPA might not approve engine “mischaracterized that risk” given negative feedback Navistar had already received from EPA); *In re Marion Merrell Dow, Inc.*, 1993 WL 393810, at *8 (W.D. Mo. Oct. 4, 1993) (general risk disclosure warning that FDA might not approve drug for over-the-counter sale was misleading given the magnitude of risk that FDA would not approve); *In re Van der Moolen Holding N.V. Secs. Litig.*, 405 F. Supp. 2d 388, 400, 415 (S.D.N.Y. 2005) (company’s risk disclosures warning that its business “could” be negatively impacted “if” it failed to comply with industry regulations were materially misleading because company already was violating industry regulations); *SEC v. Tecumseh Hldgs. Corp.*, 765 F. Supp. 2d 340, 352-54 (S.D.N.Y. 2011) (statement can be misleading where cautionary language did not adequately convey the fact that “projections were entirely divorced from reality or reasonable expectations”). “A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor’s calculations of probability.” *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (risk disclosure warning that non-compliance with environmental regulations could result in financial harm to company was misleading given non-disclosure of “on-going and serious pollution violations”); *Dolphin & Bradbury*, 512 F.3d at 640 (Bradbury's “[c]autionary words about future risk cannot

1  insulate from liability the failure to disclose that the risk" had already "transpired.").

2       This is why the two risk disclosures at issue are misleading. By warning only of hypothetical

3  "defects" that might be found in the future and that authorities may someday ask VW to "recall" its

4  cars if defects are found, they mislead the reader into believing that VW is not presently aware of

5  any problems with its cars. The truth, however, was VW already knew its cars were defective, the

6  defects could not be fixed, and it would probably have to recall or buyback every car. And, in fact,

7  in November 2014, VW did conduct a recall—a sham one—but never changed its risk warnings.

8       The complaint alleges the Offering Memoranda's risk disclosures in Sections 2.2.5 and 2.5.6

9  were misleading. Those Sections state, in part:

10   • **§2.2.5 Our future business success depends on our ability to maintain the high
11     quality of our vehicles.**
                              *       *       *

12     We may be required to implement service or recall our vehicles if there are defects in
13     parts or components that we buy or manufacture in-house. We may need to develop
       new technical solutions that require governmental authorization. …

14
                              *       *       *

15     Product quality significantly influences consumers' decision to purchase vehicles. A
16     decline in our product quality or consumer perception…could have a material
17     adverse effect on our general business activities, net assets, financial position and
       results of operations.

18   • **§2.5.6 We may face additional liability depending on the applicable laws and
19     contractual obligations**

                              *       *       *
20
       Responsible supervisory authorities may request that we perform recall campaigns
21     and could compel us to perform a recall. … [S]ubstantial numbers of vehicles could
       also be affected. The risk of a recall of a substantial number of vehicles could be
22     exacerbated due to our application of modular vehicle components that are used for
23     the production of vehicles across brands and classes ….

                              *       *       *
24
       … We may have designed products with product defects or may manufacture faulty
25     products. …

26  (*See* Compl. ¶ 175; VW Mot., Ex. A [7349-2] at 10-11.) At the time VW made these risk

27  disclosures, its senior officials and lawyers responsible for product quality and recalls were already

28  well aware of the existing emissions defects affecting every "clean diesel" car and the dire financial

consequences VW was facing as a result. In April 2014, VW's ICCT Task Force laid out the problem in stark terms: (a) the emissions defects affected 500,000 to 600,000 cars sold in the U.S., (b) U.S. authorities could conduct their own tests to look for a defeat device; (v) the cars could not be fixed, (d) VW may have to recall or buy back all the cars, and (e) VW was facing fines of $43,000 per car ($21.5 to $25.8 billion). (*Id.* ¶¶ 109-13.) The ICCT Task Force's analysis was shared with numerous high-level VW officials and lawyers. (*Id.* ¶¶ 98, 105-123.) Yet, VW never updated or revised its generic risk disclosures. (VW Mot., Ex. A [7349-2] at 10-11.)

VW did not even update these disclosures in November 2014, when it proposed recalling all "clean diesel" vehicles to implement a sham software fix as a ploy to delay discovery of the defeat device. (*Id.* ¶¶ 127-29.) It continued warning about the risk of unknown "product defects" and hypothetical "recalls." This was materially misleading because it left the reader with the impression that nothing had changed and these "risks" were nothing more than uncertain, future possibilities.

Moreover, the OM risk disclosures were not made in a vacuum. They were part and parcel of numerous other representations VW made, including those made in the Subscription Agreements and in its responses to the Underwriters' DDQs. In the DDQs, the Underwriters **directly asked** VW to confirm that that "risk factors" set forth in the Offering Memoranda "accurately reflect [VW's] views and current situation." (*See*, *supra*, p. 10; Compl. ¶ 208(f).) In response, VW confirmed that the risk factor statements in its Offering Memoranda were accurate and complete, accurately reflected VW's views and current situation, and did not omit any information an investor might consider relevant in assessing the risks of an investment in the bonds. (Compl. ¶ 210(f).)[16] When viewed in context with all its offering disclosures, including this false statement to the Underwriters (as well as its repeated touting of its supposed commitment to producing cars that reduce harmful emissions), VW's generic, non-specific risk disclosures were misleading.

The cases VW cites—almost none of which involve risk factor disclosures—are inapposite.

---

[16] The Underwriters also asked VW whether there were "any material quality issues" with its vehicles, including any "potentially leading to recall programs." (Compl. ¶ 208(b).) In its response, VW did not tell them about the emissions issues, the defeat device scheme, or the fact it already predicted those defects would (and by November 2014 did) lead to recalls. (*Id.* ¶¶ 209-14.)

The risk disclosures in this case are not *corporate puffery*[17], are not *unconnected to* the undisclosed facts[18], and are not *overshadowed or sufficiently tempered* by other statements in the OMs.[19]

VW also is wrong to suggest that its risk disclosures cannot be misleading because a company never has a duty to disclose uncharged wrongdoing. (VW Mot. at 33.) "[T]he obligation to disclose uncharged illegal conduct does not arise from the materiality of this information *alone*." *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005) (emph. added). But, like other material omissions, "it is necessary to disclose this conduct in order to prevent statements the corporation does make from misleading the public." *Id*. That is what was required here. While touting its "clean diesel" vehicles as complying with emission laws, that it was committed to reducing vehicle emissions, assuring Underwriters that it wasn't aware of any quality issues potentially "leading to recalls," VW's general risk warnings created the impression that

---

[17] *In re Level 3 Commc'ns, Inc. Sec. Ltig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (dismissing as "puffery" and "vague (if not meaningless) management-speak" statements like defendant has "proven integration experience" and is "focused on …getting synergies from all those acquisitions*"); In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (holding statement that "we believe our employee relations are good" is nonactionable puffing); *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 497 (2d Cir. 2019) (statement that company hoped to "maintain the magic" is "nothing more than puffery").

[18] VW cites *Irving Firemen's Relief & Ret. Fund* v. *Uber Techs.*, 398 F. Supp. 3d 549 (N.D. Cal. 2019), arguing that the court held that certain risk factor disclosures did not require Uber "to disclose a 'laundry list' of 'allegedly fraudulent activities.'" (VW Mot. at 25.) But what the court actually said, quoting its earlier opinion, was: "Plaintiff's omission theory failed because Uber was not under a duty to disclose a 'laundry list' of allegedly fraudulent activities *that are unconnected to the actual challenged statements*." *Id*., at 556 (emph. added). Here, the challenged statements about recalls and product defects are directly connected to the undisclosed information. *See also Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal Apr. 27, 2017) ("the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves").

[19] *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1054-56 (N.D. Cal. 2019) (PSLRA's "exacting requirements for pleading falsity" not met where elsewhere in the same document company "disclose[d] exactly what Plaintiffs claim [company] omitted); *Singh* v. *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (company's disclosures stressing the "complexity and numerosity" of the health care regulations it had to comply with and noting it would "allocate significant resources" to compliance "suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness"). Here, VW's risk disclosures did not suggest it was struggling to eliminate product defects or avoid recalls. To the contrary, they left the reader with the impression that VW faced only a risk of hypothetical defects and recalls. The truth, however, was much different.

recalls and product defects were mere possibilities, much like they are for any car company. That was misleading because VW already knew that the risk of recalls to fix a critical defect present in all these cars—*i.e.*, they did not comply with emission requirements—had already materialized.

## IV.    VW's Misleading Financial Statements Included with the May 23, 2014 Bond Offering Are Actionable Under Section 17(a)(2).

The financial statements appended to the May 23, 2014 Bond Offering Memorandum violated Section 17(a)(2), which does not require proof of scienter. In *ADR* and *Bondholders*, the Court dismissed the private bondholders' and ADR plaintiffs' Section 10(b) claims founded on these same financial statements. The Court held that the operative complaints failed to demonstrate a strong inference of scienter, as required by the PSLRA, because they alleged Winterkorn first learned that emission fraud losses were probable at the end of May. *Bondholders*, 2017 WL 3058563, at *13 ("Lacking a strong inference of scienter, Plaintiff accordingly cannot base its Section 10(b) claim on the financial statements appended to the May 2014 Offering Memorandum."); *ADR*, 258 F. Supp. 3d at 1046-47 ("The Amended Complaint does not, however, plausibly support that losses related to the emissions fraud were probable or more than remote before May 2014. Plaintiffs therefore have not adequately alleged that Winterkorn or VW AG intentionally or recklessly misstated financial statements issued before May 2014."). The SEC's claim and allegations related to these financial statements, however, are different.

The SEC is not asking the Court to reconsider its rulings in *Bondholder* and *ADR* dismissing those respective private plaintiffs' Exchange Act Section 10(b) claims tied to these financial statements. Instead, it bases its claim on Section 17(a)(2) of the Securities Act. This means the SEC must prove only that VW failed to exercise reasonable care in preparing these financial statements, and not scienter. *Blockvest*, 2018 WL 4955837, at *6; *Cole*, 2015 WL 5737275, at *6. Here, the complaint alleges that facts demonstrating that numerous VW employees—including lawyers and senior officials—should have realized well before the bond offering on May 23, 2014, that VW was facing massive financial losses that should be reflected in its financial statements.

For example, by early April, VWAG ATTORNEY 1, who sat on the Product Safety Committee and also worked on the 144A Bond offering documents, was told about the ICCT's

findings and the emissions problems with VW's vehicles. (Compl. ¶¶ 102-04.) By mid-April 2014, the ICCT Task Force was already formulating possible responses for U.S. regulators, had predicted they would look for a defeat device, and had documented the fact that VW was facing over $21 billion in liability because of the emissions fraud. (*Id.* ¶¶ 102-10.) This was more than a month before the May 23, 2014 offering and more than two weeks before the VWAG Board approved the interim financial statements included in that offering (April 29, 2014). (*Id.* ¶ 185.) On April 15, this information was provided to Gottweis, a high ranking official and direct report to Winterkorn, who knew about the defeat device. (*Id.* ¶ 112.) On April 28—a day before Winterkorn approved the misleading interim financial statements—the Task Force told Gottweis U.S. regulators would "likely" figure out VW had a defeat device. Gottweis said he would talk to Winterkorn. (*Id.* ¶ 113.)

 While the SEC's complaint raises the reasonable inference that Gottweis told Winterkorn about the Task Force's conclusions by April 29 (*see* VW Mot. at 34: "the SEC does not allege that Winterkorn learned of any government investigations and resulting financial consequences before April 29, 2014"), it is beyond dispute that VW's senior officials and lawyers knew well before then. And the May 23, 2014 Bond offering was still more than three weeks away. Someone—*e.g.*, Winterkorn, VWAG ATTORNEY 1, Gottweis, the Task Force—should have ensured that this critical information was provided to VWAG's accounting department or otherwise reflected in VWAG's financial statements. But no one did. *See Steadman*, 967 F.2d at 643 (a company is "liable merely for omitting disclosure of liabilities negligently—in other words, for failing to disclose liabilities about which [it] should have known"); *SEC v. American Realty Trust*, 586 F.2d 1001, 1006-07 (4th Cir. 1978) (imposing injunction for negligent omissions from prospectus).

 VW violated Section 17(a)(2) of the Securities Act.

## V. The Court Should Not Dismiss Any of the SEC's Prayers for Relief.

### A. VW's Request to Strike the Prayer for Injunctive Relief is Premature.

 It is premature and improper to rule, at the pleading stage, on the complaint's prayer for injunctive relief. The Federal Rules of Civil Procedure require that a complaint state a "claim" upon which relief can be granted. A complaint's sufficiency "is tested by the … statement of the claim for relief and the demand for judgment is not considered part of the claim for that purpose." 5

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1255; *Guardian Oil*, 2014 WL 7330451, at *8 (denying motion to dismiss prayer for injunction "because Defendants cannot allege that Plaintiff's requested form of relief fails to state a claim"). A claim is properly pleaded if it states a claim for any relief. *Federal Practice and Procedure* § 1255. And although FRCP 9(b) requires that allegations of "fraud or mistake" be stated "with particularity," there is no requirement that a prayer for relief be so stated.

In *Gentile*, 939 F.3d at 564, the Third Circuit reversed the dismissal of the SEC's prayer for injunctive relief at the pleading stage. *Id.* at 564. The court explained that the decision whether an injunction is appropriate should be made on a "developed record … assuming the plaintiff has stated a plausible claim for relief." *Id.* This is true because the determination of whether injunctive relief is appropriate depends primarily on whether or not the evidence demonstrates that "there is a reasonable likelihood that the wrong will be repeated." *Gabelli*, 653 F.3d at 61 (reversing order dismissing SEC's prayer for injunctive relief). Because "determining the likelihood of future violations is almost always a fact-specific inquiry," it would be "most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation." *Id.* (noting "defendants are unable to point to a single case where the SEC's prayer for injunctions against further violations was dismissed at the motion to dismiss stage based upon a finding of nonlikelihood of further violations"); *Guardian Oil*, 2014 WL 7330451, at *8 ("Also, it would be premature to dismiss Plaintiff's request for injunctive relief as no fact-finding has taken place.").[20]

The only example of a court throwing out a complaint's prayer for injunctive relief at the Rule 12(b)(6) stage that VW cites is the district court's decision in *Gabelli*. VW, however, mis-cites that case as being reversed on "other grounds." In fact, the Second Circuit directly reversed the district court's decision to dismiss the complaint's prayer for injunctive relief, precisely because it was premature. *Gabelli*, 653 F.3d at 61. The Third Circuit later cited that reversal in also holding

---

[20] The Supreme Court subsequently reversed the Second Circuit's holding in *Gabelli* that the five-year statute of limitation set forth in Section 2462 is subject to a discovery rule. *Gabelli*, 133 S. Ct. 1216 (2013). That reversal, however, "does not affect" the other holdings in the Second Circuit's opinion. *SEC v. Gabelli*, 518 F. App'x 32 (2d Cir. 2013).

that the district court erred by dismissing the prayer for injunctive relief based on the SEC's purported failure to allege facts demonstrating a likelihood of future misconduct. *Gentile*, 939 F.3d at 564; *see also Kameli*, 2020 WL 2452154, at \*8 n.11 (reading *Gabelli* the same way and holding that arguments about the propriety of injunctive relief "raise[] factual questions that are not properly decided at [the motion-to-dismiss] stage"). Other courts that have addressed the issue agree that it is improper to strike the SEC's prayer for injunctive relief at the pleading stage based on the purported failure to properly allege a likelihood of repeated misconduct. *See*, *e.g.*, *SEC v. Drake*, 2017 WL 6507766, at \*7 (C.D. Cal. Dec. 18, 2017) ("rulings on remedies are typically made after finding liability—not at the motion to dismiss stage."); *SEC v. Dynkowski*, 2015 WL 12851237, at \*1 n.1 (D. Del. July 29, 2015) (motion to dismiss prayer for injunctive relief was "premature"); *SEC v. Melvin*, 2013 WL 12062834, at \*6 (N.D. Ga. June 26, 2013) (same).[21]

Moreover, even if the SEC was required to allege facts in the complaint demonstrating its entitlement to injunctive relief, it has done so here. In *Gabelli*, on top of ruling that dismissal of the prayer for injunctive relief was premature, the Second Circuit went on to find that "in any event" the SEC's complaint "sufficiently pleads a likelihood of future violations." *Gabelli*, 653 F.3d at 61. "[S]ince the complaint alleges that for almost three years Gabelli and Alpert intentionally aided and abetted Advisers Act violations and since fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations, we conclude that the complaint sufficiently pleads a reasonable likelihood of future violations." *Id.* (quote and cite omitted). The SEC alleges that, for a period of 13 months, VW fraudulently sold approximately $13 billion in bonds and ABS to investors, over the course of seven separate securities offerings. (Compl. ¶¶ 18, 159, 231.)  The

---

[21] In every other decision cited by VW, the case proceeded past the pleading stage and the court made a determination about the appropriateness of issuing an injunction based on the evidence presented. *See SEC v. Wheeler*, 56 F. Supp. 3d 241, 248 (W.D.N.Y. 2014) (following entry of default judgment); *Johnson v. SEC*, 87 F.3d 484, 490 (D. D.C. 1996) (appeal of SEC's affirmance of ALJ initial decision imposing permanent injunction following two-day administrative hearing); *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 533 (2d Cir. 1984) (appeal and reversal of district court order granting motion for preliminary injunction following evidentiary presentations by parties, with instructions to issue more limited preliminary injunction); *SEC v. Shanahan*, 2010 WL 173819, at \*14 (D. Minn. Jan. 13, 2010) (summary judgment).

complaint also alleges VW's fraud was perpetrated with scienter by VW's officers, lawyers, and other senior personnel (see, e.g., id. ¶¶ 1-23, 65, 98.); it made hundreds of millions of dollars off of its defrauded bond and ABS purchasers, which it has not repaid (id. ¶ 23) and, it reentered the U.S. securities markets after a three year hiatus (see id. ¶¶ 21, 180).

The SEC's prayer for injunctive relief should not be dismissed.

**B.     The Court Also Should Not Dismiss the Complaint's Prayer for Disgorgement.**

For the same reasons, it is premature and improper to rule on the SEC's prayer for disgorgement. "Disgorgement is designed to deprive a wrongdoer of unjust enrichment." *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1113 (9th Cir. 2006) (cite and internal omitted). The "amount of disgorgement should include all gains flowing from the illegal activities." *Id.* (cite and quote omitted). Although VW has paid substantial amounts to resolve criminal charges and to compensate different victims (*e.g.*, car buyers) for engaging in different misconduct (*e.g.*, polluting the environment and selling defective cars), it has paid nothing to the 144A Bond and ABS investors for the hundreds of millions of dollars in interest payments they were cheated out of as a result of VW's securities fraud. (*Id.* ¶¶ 22-23.) If the SEC prevails in this action, it will seek to compensate those investors.

VW claims it "is irrelevant" that its victims in this case are its defrauded investors rather than its defrauded car buyers. That is wrong; it makes all the difference. VW cannot escape liability for disgorgement to its bond and ABS purchasers on the ground that it already settled with car buyers.

Not surprisingly, VW does not cite a single case dismissing the SEC's prayer for disgorgement as inequitable at the pleading stage. In fact, all the cases it cites—both the SEC enforcement actions and private lawsuits—actually support the SEC's position that the complaint's prayer for disgorgement cannot be dismissed in these circumstances. In each SEC case, the SEC's request for disgorgement was denied—nearly always at summary judgment or later—because either: (i) it was redundant of the financial restitution ordered in the defendant's parallel criminal case, (ii) it was duplicative of the disgorgement already ordered against co-defendants in the SEC case, or (c) the SEC could not allege, even after discovery, that the defendant received a financial

benefit from fraud.[22] None of those situations are applicable here. Refusing to order disgorgement may make sense where, unlike here, the SEC and criminal authorities filed parallel actions alleging defendants committed the same fraud against the same victims. But the class of victims in this case—securities purchasers vs. car buyers—are completely different. So too are the illegal profits VW generated by defrauding each group. On the one hand, VW made money by fraudulently selling securities to investors; on the other hand, it profited by fraudulently selling defective cars to car buyers.

VW also cites a few cases involving private litigants; but, none help. In those cases, the courts struck the requests for damages because, as a matter of state law, plaintiff was not entitled to recover disgorgement. *See, e.g., Gonzales v. Citimortgage, Inc.*, 2015 WL 3505533, at *3 (N.D. Cal. June 3, 2015) (money damages not available under applicable state law until a foreclosure sale takes place); *Bruton v. Gerber Products Co.*, 2018 WL 4181903 (N.D. Cal. Aug. 31, 2018) ("It is well established that nonrestitutionary disgorgement is unavailable under the UCL [California's Unfair Competition Law]"). These cases have no application here. Under controlling Ninth Circuit precedent, the SEC may seek and recover disgorgement. *SEC v. Liu*, 754 F. App'x 505 (9th Cir. 2018), *cert. granted* 140 S. Ct. 451 (2019).

The complaint's prayer for disgorgement simply asks VW to surrender the profits it illicitly obtained by defrauding investors. That is fair and equitable, not "piling on."

---

[22] *See SEC v. Pace*, 173 F. Supp. 2d 30, 32, 34 (D.D.C. 2001) (summ. jdgt.) (disgorgement "would be redundant" with defendant's criminal restitution resulting from "same diversion of funds"); *SEC v. Durham*, 2017 WL 3581640, at *7 (S.D. Ind. Aug. 18, 2017) (summ. jdgt.) (same); *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391, 394-95 (S.D.N.Y. 2010) (summ. jdgt.) (same); *SEC v. Monarch Funding Corp.*, 1996 WL 348209, at *10-*11 (S.D.N.Y. June 24, 1996) (summ. jdgt.) (criminal "securities-fraud charges related to the same activities at issue here"); *Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (appeal after admin. hrg.) (reducing Hateleys' disgorgement to $5,062.50 because that is all they received and co-defendant was already "ordered to disgorge the approximately $50,000 in commissions that he received"); *SEC v. Berry*, 2006 WL 6382128, at *11 (N.D. Cal. Oct. 3, 2019) (dismissing because no allegation that defendant was "unjustly enriched"); *SEC v. Victorville*, 2014 WL 12588688, at *10-*11 (C.D. Cal. Oct. 14, 2014) (even with "discovery in this action," SEC could not adequately allege defendant received financial benefit.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For all the foregoing reasons, the Court should deny VW's Motion to Dismiss the complaint in its entirety.

Dated:  May 28, 2020                    Respectfully submitted,


                                        /s/ Daniel J. Hayes
                                        U.S. Securities and Exchange Commission
                                        Chicago Regional Office